**In the Matter of the Termination of the Parent–Child Relationship of Rhonda YOUNGBLOOD and Her Minor Child, A.Y., Appellant–Respondent,**

v.

**JEFFERSON COUNTY DIVISION OF FAMILY AND CHILDREN, Appellee–Petitioner.**

No. 39A04–0505–JV–273.

Court of Appeals of Indiana.

Dec. 14, 2005.

Transfer Denied March 9, 2006.

Leanna Weissmann, Lawrenceburg, IN, Attorney for Appellant.

Alison T. Frazier, Alcorn Goering & Sage, Madison, IN, Attorney for Appellee.

## OPINION

SHARPNACK, Judge.

Rhonda Youngblood ("Mother") appeals the trial court's denial of her motion to correct error. Mother raises one issue, which we restate as whether the trial court abused its discretion by denying Mother's motion to correct error in which she peti-tioned the trial court to set aside her con-sent to the voluntary termination of her parental rights to her daughter, A.Y. We affirm.

The relevant facts follow. When A.Y. was born on January 30, 2003, her amniot-ic fluid was filled with blood, which is associated with cocaine use, and with me-conium, which is suggestive of severe dis-tress. Also, at the time of A.Y.'s birth, she had a high heart rate and was irritable. Mother admitted to using alcohol, marijua-na, and Zanax during her pregnancy. Mother also admitted that she used co-caine during the first trimester of her pregnancy.

On January 31, 2003, the Jefferson County Division of Family and Children ("JCDFC") filed a petition alleging that A.Y. was a child in need of services ("CHINS"). The trial court authorized the JCDFC to take A.Y. into immediate protective custody.

The JCDFC offered services to Mother, and she demonstrated a willingness to par-ticipate. Mother and A.Y. were eventually reunited in April 2003. In June 2003, A.Y. was hospitalized and diagnosed with hav-ing a rare heart condition, and the hospital staff expressed their concern about Moth-er's ability to care for A.Y. and to meet her special medical needs.

In August 2003, A.Y. was removed from Mother's home because Mother was found intoxicated in the house with A.Y. and had failed to give A.Y. her heart medication. Over the next year, Mother suffered nu-merous relapses in her drug and alcohol addictions, failed to complete treatment programs, and engaged in several instanc-es of self-mutilation. In April 2004, Moth-er gave birth to another baby girl, who tested positive for cocaine in her system.

In October 2004, the JCDFC filed a petition for the involuntary termination of

the parent-child relationship between Mother and A.Y. On November 16, 2004, Mother appeared with counsel at a termination hearing and notified the trial court that she intended to consent to the termination of her parental rights to A.Y.[1] "with the understanding that it be an open adoption and that matters be ... a visitation remain open between now and the time of the adoption as well as afterwards." Transcript at 3. The trial court then advised Mother of her rights and that her consent would be permanent and could not be revoked unless it was obtained by fraud or duress or unless she was incompetent. The trial court, which noted that Mother had representation and the advice of counsel, asked Mother if she still intended to voluntarily consent to the termination, and Mother responded that she did. That evening or the following day,[2] Mother signed a "Consent to Termination of Parent–Child Relationship," in which she acknowledged that she had received a notice of rights form[3] and "knowingly and voluntarily consent[ed] to the termination of [her] parental-child relationship with [A.Y.]." Appellant's Appendix at 347. Mother's attorney reviewed the documents with Mother and notarized the consent by affirming that Mother personally appeared before her and "stated that the representations therein contained [were] true." *Id.* at 347–348.

In December 2004, the trial court entered its order terminating Mother's parental rights to A.Y. In January 2005, Mother filed a motion to correct error in which she petitioned the trial court to set aside her consent to terminate her parental rights because the consent was "obtained as a result of fraud, duress or mental incompetence." *Id.* at 349. During the hearing on Mother's motion, Mother testified that she "check[ed] out" or "blanked out" and did not understand what she was doing when she consented to terminate her rights. Transcript at 11, 18. However, Mother also testified that she remembered signing the consent with her attorney and remembered attending the termination hearing and telling the trial court that she understood. Mother testified:

> I thought I was ... actually, I don't know exactly what I was doing. All I know is that I ... I wanted to see [A.Y.], and I'm continuing to see ... I was told if I ... if I didn't sign them and [the trial court] took my rights I would never see her, and if I did sign them I could. This ... I wasn't really ... I don't know. I wasn't thinking right. I just want ... I just wanted her to be happy, and I wanted her to be with me.

*Id.* at 16–17. Mother's attorney stipulated that she reviewed the consent documents with Mother. The JCDFC case worker, Cindy Adams, testified that she explained to Mother that if she proceeded with a voluntary termination that the adoption of A.Y. would be an open adoption[4] and that

---

1. A.Y.'s father, Adam Denning ("Father"), also appeared at the hearing and notified the trial court that he wanted to consent to a voluntary termination of his parental rights to A.Y. Father thereafter consented to the termination of his parental rights and does not challenge his consent on appeal.

2. Mother testified that she signed the consent to terminate on the evening of the termination hearing, which was November 16, 2004, but the consent is dated November 17, 2004.

3. The notice of rights form advised Mother that her "consent is permanent and cannot be revoked or set aside unless it was obtained by fraud or duress, or unless [she is] incompetent[.]" Appellant's Appendix at 345.

4. We have previously noted that an "open adoption" is "one in which the natural parent has visitation rights with her child" and "is not recognized in Indiana." *In re Termination of the Parent–Child Relationship of Infant Ellis,* 681 N.E.2d 1145, 1149 (Ind.Ct. App.1997), *trans. denied, abrogated on other*

Mother would be able see A.Y. The case worker, who had worked with Mother for two years, testified that other than the fact that Mother was "visibly upset" on the day of the termination hearing, there was nothing about her appearance that would lead her to believe that Mother did not understand what was happening. *Id.* at 32. The trial court denied Mother's motion to correct error and issued an order, which provides, in relevant part: "The Court now finds that the mother Rhonda Youngblood has failed to convince the Court that the waiver and consent in the file was … obtained by fraud or duress, [ ]or was she incompetent at the time she signed [the] same." Appellant's Appendix at 354.

▋ The sole issue is whether the trial court abused its discretion by denying Mother's motion to correct error in which she petitioned the trial court to set aside her consent to the voluntary termination of her parental rights to A.Y. "The standard of appellate review of trial court rulings on motions to correct error is abuse of discretion." *Paragon Family Restaurant v.*

grounds by *Neal v. DeKalb County Div. Of Family and Children*, 796 N.E.2d 280 (Ind. 2003). However, we also note that Ind.Code § 31–19–16–1 provides: "At the time an adoption decree is entered, the court entering the adoption decree may grant postadoption contact privileges under [Ind.Code § 31–19–16–2] to a birth parent who has: (1) consented to the adoption; or (2) voluntarily terminated the parent-child relationship." Ind. Code § 31–19–16–2 provides:

A court may grant postadoption contact privileges if:
(1) the court determines that the best interests of the child would be served by granting postadoption contact privileges;
(2) the child is at least two (2) years of age and the court finds that there is a significant emotional attachment between the child and the birth parent;
(3) each adoptive parent consents to the granting of postadoption contact privileges;
(4) the adoptive parents and the birth parents:

*Bartolini*, 799 N.E.2d 1048, 1055 (Ind. 2003). "The issue of an invalid consent may be raised by a petition to withdraw consent, and the burden of proof in such a matter falls on the petitioner." *See Bell v. A.R.H.*, 654 N.E.2d 29, 32 (Ind.Ct.App. 1995) (reviewing a petitioner's challenge to her consent to adoption).

▋ "The voluntary termination of the parent-child relationship is controlled by statute." *Neal v. DeKalb County Div. of Family and Children*, 796 N.E.2d 280, 282 (Ind.2003). In order for the court to accept a parent's voluntary consent to the termination of parental rights, Ind.Code § 31–35–1–6(a) provides that:

[T]he parents must give their consent in open court unless the court makes findings of fact upon the record that:

(1) the parents gave their consent in writing before a person authorized by law to take acknowledgments;
(2) the parents were notified of their constitutional and other legal rights

(A) execute a postadoption contact agreement; and
(B) file the agreement with the court;
(5) the licensed child placing agency sponsoring the adoption and the child's court appointed special advocate or guardian ad litem appointed under IC 31–32–3 recommends to the court the postadoption contact agreement, or if there is no licensed child placing agency sponsoring the adoption, the county office of family and children or other agency that prepared an adoption report under IC 31–19–8–5 is informed of the contents of the postadoption contact agreement and comments on the agreement in the agency's report to the court;
(6) consent to postadoption contact is obtained from the child if the child is at least twelve (12) years of age; and
(7) the postadoption contact agreement is approved by the court.

and of the consequences of their actions under section 12 of this chapter; and

(3) the parents failed to appear.

Thus, under this statute, when a parent executes a written consent to the voluntary termination of her parental rights and appears in open court to acknowledge her consent to the termination, that consent will be deemed valid. *See Neal,* 796 N.E.2d at 285 (holding that "[a] parent's written consent to the voluntary termination of her parental rights is invalid unless she appears in open court to acknowledge her consent to the termination. . . .").

■■■ Another provision of the statute dealing with the voluntary termination of the parent-child relationship provides:

For purposes of sections 6 and 8 of this chapter, the parents must be advised that:

(1) their consent is permanent and cannot be revoked or set aside unless it was obtained by fraud or duress or unless the parent is incompetent;

\* \* \* \* \* \*

(8) the parents will receive notice of the hearing at which the court will decide if their consent was voluntary, and the parents may appear at the hearing and allege that the consent was not voluntary.

Ind.Code § 31–35–1–12. "[A] parent's ability to withdraw [her] consent to the termination of [her] parental rights is extremely limited." *In re J.W.W.R.,* 712 N.E.2d 1081, 1085 (Ind.Ct.App.1999), *trans. denied, abrogated on other grounds by Neal,* 796 N.E.2d at 280. "A parent who executes a voluntary relinquishment of parental rights is bound by the consequences of such action, unless the relinquishment was procured by fraud, undue influence, duress, or other consent-vitiat-

ing factors." *In re M.R.,* 728 N.E.2d 204, 209 (Ind.Ct.App.2000) (citation omitted), *trans. denied.* "If there is any competent evidence of probative value that[:] (1) fraud or duress was present when the written consent was given; or (2) a parent was incompetent[,] the [trial] court shall dismiss the petition or continue the proceeding." Ind.Code § 31–35–1–7(c).

Here, in November 2004, Mother appeared with counsel at a termination hearing, notified the trial court that she intended to consent to the termination of her parental rights, and thereafter signed a consent to voluntarily relinquish her parental rights to A.Y., which was notarized by her attorney. The trial court terminated Mother's parental rights to A.Y., and one month later, Mother petitioned the trial court set aside her consent to terminate parental rights because her consent was not voluntary. After a holding a hearing on the matter, the trial court denied Mother's petition.

On appeal, Mother argues that the trial court erred by denying her petition to set aside her consent to terminate her parental rights because her consent was obtained by fraud or duress and because she was incompetent. We will address each argument in turn.

### 1. *Fraud*

■■■ Mother contends that her written consent to voluntarily terminate her parental rights to A.Y. was obtained by fraud because she believed that she would be able to see A.Y. or get her back if she consented to the termination and because she was "mislead [sic] into believing a voluntary termination was something that it was not." Appellant's Brief at 6; Appellant's Reply Brief at 2. The elements of actual fraud are: (1) material representation of past or existing facts by the party to be charged; (2) which was false; (3)

which was made with knowledge or reckless ignorance of the falseness; (4) was relied upon by the complaining party; and (5) proximately caused the complaining party injury. *Rice v. Strunk,* 670 N.E.2d 1280, 1289 (Ind.1996).

Here, during the termination hearing, the trial court noted that Mother intended to consent to the termination of her parental rights to A.Y. "with the understanding that it be an open adoption and that matters be . . . a visitation remain open between now and the time of the adoption as well as afterwards." Transcript at 3. Furthermore, during the hearing on Mother's petition to set aside her consent, the JCDFC case worker, Cindy Adams, testified that she explained to Mother that if she proceeded with a voluntary termination that the adoption of A.Y. would be an open adoption and that Mother would be able have visitation with A.Y. Mother has not alleged that she has been denied visitation with A.Y. following the execution of her consent to terminate her parental rights. The record before us indicates that A.Y. is living with foster parents and has not yet been adopted. It appears that all concerned, including the trial court, as noted above, contemplate that the adoption will be an "open" one with some continuing contact between Mother and A.Y. That will require the consent of any adoptive parents, *see* Ind.Code § 31–19–16–2(3), but it is clear no representations that would constitute fraud were made to induce Mother's consent. Accordingly, Mother failed to show that her consent to terminate was obtained by fraud, and the trial court did not err by denying Mother's petition to set aside her consent on this basis. *See, e.g., In re Termination of the Parent–Child Relationship of Infant Ellis,* 681 N.E.2d 1145, 1151 (Ind.Ct.App.1997) (holding that the mother had failed to establish that her consent to terminate her parental rights was obtained by fraud

where there was no false material representation presented), *trans. denied, abrogated on other grounds by Neal,* 796 N.E.2d at 280.

2. *Duress*

 Mother contends that her consent to terminate her parental rights to A.Y. was obtained under duress because "she was pressured by the caseworker." Appellant's Brief at 6. "[I]n order to avoid a contract on the basis of duress, there must be an actual or threatened violence of restraint of a man's person contrary to law, to compel him to enter into a contract or discharge one." *Carrasco v. Grubb,* 824 N.E.2d 705, 711 (Ind.Ct.App.2005) (quotations and citation omitted), *reh'g denied, trans. denied.* In deciding whether a person signed a document under duress, "the ultimate fact to be determined is whether or not the purported victim was deprived of the free exercise of his own will." *Raymundo v. Hammond Clinic Ass'n,* 449 N.E.2d 276, 283 (Ind.1983).

 Here, there is no evidence of any threatened violence or physical restraint to Mother. Mother claims that she was under "incredible stress" and "unfair duress" when she signed the consent. Appellant's Brief at 6. "However, emotions, tensions, and pressure are . . . insufficient to void a consent unless they rise to the level of overcoming one's volition." *Ellis,* 681 N.E.2d at 1151 (citation omitted). In addition, Mother was represented by counsel, and Mother's attorney reviewed the consent documents with Mother and notarized the consent by affirming that Mother personally appeared before her and "stated that the representations therein contained [were] true." Appellant's Appendix at 347–348. Mother has failed to show that her free will was overcome when she signed the consent. Accordingly, Mother

failed to show that her consent to terminate was obtained by duress, and the trial court did not err by denying Mother's petition to set aside her consent on this basis. *See, e.g., In re M.S.,* 551 N.E.2d 881, 884 (Ind.Ct.App.1990) (rejecting a mother's contention that her consent to relinquish her parental rights was obtained under duress where the mother's proof of duress was that she was "emotionally upset"), *reh'g denied, trans. denied, cert. denied,* 498 U.S. 1121, 111 S.Ct. 1075, 112 L.Ed.2d 1181 (1991); *see also In re Paternity of K.R.H.,* 784 N.E.2d 985, 990 (Ind. Ct.App.2003) (holding that a party's claim that she felt "pressured" did not rise to the level required for a finding of duress).

### 3. *Incompetence*

█ Mother argues that she was incompetent at the time she signed the consent papers because she had "problems in the past" with drug addiction and suicide attempts and because she was "confused on the day she signed the consent form" and "unaware that she was signing her rights away to A.Y." Appellant's Brief at 7–8.

█ Under Ind.Code § 31–35–1–12(1), a parent's consent to a voluntary termination of her parental rights cannot be "set aside unless ... the parent was incompetent." Thus, Mother had the burden to show that she was "incompetent." Under the rules of statutory construction, when construing a statute, the legislature's definition of a word binds us. *Indiana Office of Envtl. Adjudication v. Kunz,* 714 N.E.2d 1190, 1193 (Ind.Ct.App.1999). However, the statute pertaining to voluntary termination of parental rights does not define "incompetent." When the legislature has not defined a word, we give the word its common and ordinary meaning. *Id.* In order to determine the plain and ordinary meaning of words, we may prop-

erly consult English language dictionaries. *Id.* "Incompetent" is defined as "[o]f inadequate ability or fitness; not having the requisite capacity or qualification; incapable." THE OXFORD ENGLISH DICTIONARY (2nd ed. 1989), *available at* http:// www.oed.com (last visited November 30, 2005). In addition, "incompetency" is the "[l]ack of ability, knowledge, legal qualification, or fitness to discharge the required duty or professional obligation." BLACK'S LAW DICTIONARY 765 (6th ed. 1990).

Here, Mother appeared with counsel at a termination hearing and notified the trial court that she intended to consent to the termination of her parental rights. The trial court advised Mother of her rights and that her consent would be permanent. Thereafter, Mother's attorney reviewed the consent documents with Mother, the documents provided that Mother's consent to terminate her parental rights would be permanent, and Mother signed the consent to voluntarily relinquish her parental rights to A.Y. The case worker, who had worked with Mother for two years, testified that other than the fact that Mother was "visibly upset" on the day of the termination hearing, there was nothing about her appearance that would lead her to believe that Mother did not understand what was happening. Transcript at 32.

█ Mother contends that she was incompetent when she signed the consent because she had attempted suicide one year prior to signing the termination consent. However, Mother's actions one year prior to signing the consent do not show how she was incompetent at the time she signed the consent. *See Hays v. Harmon,* 809 N.E.2d 460, 465 (Ind.Ct.App.2004) (holding that although evidence of a testator's mental condition prior to the date of execution of a will is admissible, it is a testator's soundness of mind at the time of executing a will that is controlling). Moth-

er presents no argument that she was under the influence of drugs or suicidal at the time she consented to the termination. Furthermore, her claimed "confusion" does not rise to the level of a showing of incompetence that would require the trial court to set aside her consent to terminate her parental rights. Accordingly, Mother failed to show that her consent to terminate was obtained while she was incompetent, and the trial court did not err by denying Mother's petition to set aside her consent on this basis. *See, e.g., In re M.S.,* 551 N.E.2d at 884 (holding that a mother's consent to terminate her parental rights was voluntary where the mother presented no evidence that "at the time of her consent" she was incoherent or distraught to such a degree that she could not control her faculties).

In summary, Mother has failed to show that her consent to terminate her parent-child relationship with A.Y. was executed under fraud or duress or while she was incompetent.

For the foregoing reasons, we affirm the trial court's denial of Mother's motion to correct error in which she petitioned the trial court to set aside her consent to the voluntary termination of her parent-child relationship with A.Y.

Affirmed.

RILEY, J. and BARNES, J. concur.