**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Aug 14 2014, 9:37 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**NOAH L. GAMBILL**
Wagner, Crawford and Gambill
Terre Haute, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
**DAVID E. COREY**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE VOLUNTARY TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: M.C., Jr., | ) ) ) ) | |
| M.C., Sr., Father, | ) ) | |
| Appellant-Respondent, | ) ) | No. 84A01-1302-JT-51 |
| vs. | ) ) | |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE VIGO CIRCUIT COURT
The Honorable David R. Bolk, Judge
The Honorable Daniel W. Kelly, Magistrate
Cause No. 84C01-1206-JT-666

**August 14, 2014**

**BROWN, Judge**

M.C. ("Father") appeals the denial of his motion for relief from judgment following the termination of his parental rights to his child, M.C., II.[1]  Father raises one issue on appeal, which we revise and restate as whether the trial court erred in denying his motion for relief from judgment.  We affirm.

## FACTS AND PROCEDURAL HISTORY

Father is the biological father of M.C., II, born in September 2005.  On June 5, 2012, the Indiana Department of Child Services ("DCS") filed a Voluntary Petition for Termination of Parent-Child Relationship.[2]  The Petition alleged in part that Father had executed a Consent to Voluntary Termination of Parental Rights and Waiver of Notice of Hearing, attached as an exhibit to the Petition, that the termination was in the best interest of M.C., II, and that DCS had a satisfactory plan for the future care and treatment of M.C., II.  The Consent to Voluntary Termination states that Father understands that his consent to the termination of his parental rights is irrevocable and that he voluntarily and

---

[1] The mother of M.C., II, does not participate in this appeal.  Although the caption pages of the appellate briefs identify Father's child as M.C., Jr., Father and the caption pages of the filings in the proceedings below identify Father's child as M.C., II.

[2] At a subsequent hearing on October 2, 2012, Father testified that there had been a previous termination case filed against him, that there had been a trial, and that it was found that his rights should not be terminated.  He testified that the CHINS case continued on and that, after several months, DCS filed another termination case.  In its June 24, 2013 order denying Father's motion for relief from judgment, the trial court noted that a previous involuntary petition to terminate parental rights had been filed by DCS under cause number 84C01-0910-JT-1266, that the petition was denied on October 27, 2011, after a factfinding hearing, and that the court had stated that it felt that guardianship would be a permanency option that would best further M.C., II's best interests.

irrevocably consents to the termination of all of his rights as a parent with reference to M.C., II.

On June 19, 2012, the court held a hearing at which Father did not appear. In response to questions by the court regarding the case, counsel for DCS indicated that Father had been "tried twice" and that he was tried once under another judge who "didn't rule on it" and "then we tried it again under yours." June 19, 2012 Transcript at 6. The court asked what had occurred since the last time Father was in court when Father stated he did not desire a termination of his parental rights, and DCS said that Father was in "the Vigo County Jail at that time [of the] second trial," that he had been "sentenced to Putnamville Correctional Facility, released, and [was] serving 13 to 15 months in the work release program," that he "had a two week period of where he was released from incarceration to get his affairs in order," that Father "had contacted the paternal grandparents about doing a voluntary," and that the paternal grandparents called DCS. Id. at 6-7. The court then noted that it was "just trying to figure out [sic] because it's just unusual" and "maybe it's not unusual. It's just unusual for me. I just haven't seen it." Id. at 7. Counsel for DCS replied that she had spoken with Father's counsel "as to whether or not he wanted to be present and he said, 'If he doesn't need me there, I don't need to be present,'" and "[h]e understands what he's . . . I mean, we've already been through this twice." Id. The court responded "Okay. And that's what . . . just I was inquiring. I didn't know. Once there's an involuntary not granted, what efforts may be undertaken to try to make it a voluntary. But it sounds like he initiated it." Id. The court then stated that it would "go ahead then and approve the voluntary termination." Id. at 8.

3

The court entered an order dated June 19, 2012, finding that the termination of the parent-child relationship between Father and M.C., II, had been agreed to by Father and was in the best interests of M.C., II, and permanently terminating Father's parental rights with respect to M.C., II.

On August 7, 2012, the court held a review hearing at which Father by counsel made an oral motion to set aside both his consent and the June 19, 2012 termination order. At the hearing, Father's counsel asked Father "Why do you think the judge should vacate your termination? Your consent? Because of pressure and duress from somebody?" August 7, 2012 Transcript at 4. Father replied "[y]eah, my father [("Grandfather")] told me if I signed the termination that she[3] would no longer be able to be around our child," that "my son would be with my grandmother[4] and that he would promise me that I would get visits and that he would pay for my work release," that "I had no means to pay for my work release and, therefore, I would have went back to prison," and that "[s]o I would have been out of the picture regardless anyways." Id. Near the end of the hearing, the court stated:

> And just to make the record kind of complete on this because of the importance of a termination, what the court understands having happened, was we had a termination case, a hearing on [F]ather's termination a while back . . . and the court, from the bench, went ahead because it looked like everything was in order and stated that we would approve the voluntary termination based upon having the consents of both parties while here. And then I started wondering about what had happened because I know we had had . . . a trial on an involuntary termination several months earlier which the court found that it would not be in the best interests of the child for the involuntary termination to occur and suggested . . . a permanency

---

[3] Father did not specify the name of the person to whom he was referring.

[4] Hereafter, we will refer Grandfather's mother, who is the great-grandmother of M.C., II, as "Great Grandmother."

4

plan of guardianship based upon the evidence that was presented at the involuntary termination trial where it was found by the witnesses that [F]ather and child had a decent relationship and that he had been participating in services. . . . I didn't know why a guardianship hadn't been pursued in the intervening months and I wondered, I was curious about what had changed [Father's] mind. It concerned me that he had an attorney on the underlying CHINS case and that then there was a voluntary consent without the attorney, although, I understanding from talking to the counsel for everybody, that he waived counsel, did not want to have counsel prior to executing the documents . . . . I know that the requirements for voluntary consent are pretty strict. It's usually supposed to be done in open court . . . .

Id. at 9-10. The court appointed counsel for Father and scheduled a hearing for October 2, 2012.

At the hearing on October 2, 2012, the court heard the testimony of Father, Father's mother ("Grandmother"), Jason Holt who worked for DCS, and Grandfather. Father testified that he signed a voluntary consent to the termination of his parental rights in June 2012 in the presence of a DCS representative and a notary public and that he did not have legal representation at that time. When asked what convinced him that "signing off on a voluntary termination would be a good thing to do," Father testified:

Because . . . I had to go to work release and we'd been talking about the money to get into work release. [Grandfather] wasn't going to help me and I knew if I went back to prison, [DCS] was inevitably going to file for another termination and I was going to lose [M.C., II] this time. That would be the third time that I've went back. So [Grandfather] was like, "Look, [Great Grandmother has] been going through all this trouble with [DCS] because she's gotta sign out every time she leaves the state and you don't understand the stress that this is causing her." I'm like . . . Well, look, if I'm going to have to go back to prison, I'd rather . . . I'd much rather it just be easier and him go straight to [Great Grandmother]." That way, I knew [M.C., II, would] go to [Great Grandmother]. And [Grandfather's] like, "Well, look, if you just go ahead and sign off on these papers[,] I'll pay for your work release."

5

Well, he paid for my work release. Whenever I was in there, I didn't even want to sign the papers. I was crying. I asked to step outside I could call [Grandfather] and I called and talked to [him]. He just kept confirming that it . . . "There's no way that [Great Grandmother], if you're doing right and you're not doing drugs, your [Great Grandmother's] going to keep your son from you. Just go ahead and sign off on the papers and I'll make sure that she doesn't keep your son from you." Well, I still haven't seen my son and I've been out since May. They haven't allowed me to see my child. And as soon I done it, once I got into work release, I didn't want to . . . I wanted to retract my signature. But it got me into work release where I could still have a fight for my son.

October 2, 2012 Transcript at 5-6. Father testified that it was his understanding that he "would never be kept from [his] son." Id. at 6. Father further testified that he was promised funding for his community corrections, but that Grandfather paid only $244 and not the $800 he owed for the previous time.

On cross-examination, Father again indicated that Grandfather promised him certain things for his consent to the termination, including to pay for all of his work release and that "[h]e promised that he wouldn't allow anybody to keep my child from me if I was doing what was right." Id. at 10. Father also indicated "I didn't even want to do this" and that he had to "step out of the room for about 30 minutes so [he] could talk to [Grandfather]." Id. at 10-11. When asked if Grandfather threatened him in any way, Father answered: "No. It wasn't a threat. If I didn't have that, I was going back to prison and you guys were going to file again if I would have . . . that's what you do every time I go back to jail. You guys would have filed a termination again . . . ." Id. at 11. When asked "[Grandfather], throughout the course of your life, has given you a lot of money to help get you out of trouble, hasn't he," Father answered "Just recently. Since he's been out of prison." Id. at 12. Father stated that Grandfather had hired an attorney for him on

6

two different matters during the previous four years, and that he did not have "the means to get into work release" and that Grandfather paid for him to do so. Id. at 13. On re-direct examination, Father testified that the first time Grandfather made the statements upon which he relied was when he was in the car with Grandfather and Grandmother "in between the time period that [he] got out, May 22nd, and before [he] went to work release, June 20th. Most likely the end of May." Id. at 16.

Grandmother testified that she recalled the conversation between Father and Grandfather in the car and that she remembered the discussion about Grandfather paying for the cost of the work release program for Father. When asked if she heard any discussions that day about Father signing off on a voluntary termination, Grandmother stated "No. He said he was going to." Id. at 18. When asked "[h]e said that that day," Grandmother replied "[a]nd [Grandfather] told me to tell him to get up there and sign the papers." Id. Grandmother indicated Father said he was going to sign off on a voluntary termination so that "his grandma could have him" and M.C., II "wouldn't go in foster care." Id. Grandmother indicated she believed Father's understanding was that he was still going to be able to be a part of his child's life. Grandmother further indicated Grandfather paid for approximately $300 for Father's work release, refused to make further payments, and told her that "he wasn't going to do it no more," that "[i]t was all up to [Father]," and that "[h]e had to do it on his own." Id. at 19. Grandmother also stated that she had a conversation later with Grandfather in which they argued regarding "why [Grandfather] said he would [pay] and then he said he wouldn't." Id. at 22. When

7

asked "[d]uring that argument, there was nothing . . . no issue brought up as to a voluntary termination," and Grandmother testified:

> Not that I recall. Just to get him over there and . . . him and [Father] had talked. I didn't . . . I wasn't there. I was in the car but, you know, I couldn't hear what his dad was saying. He said that if he'd sign the papers, then he would pay for his work release. That's what I understood.

Id. at 23. On cross-examination, Grandmother was asked "you did not hear your son . . . consenting to the termination of his rights with regards to his son and the payment of those fees," and she answered "No, but that's the way I understood it was supposed to be. But no, I didn't hear that exactly." Id. at 23-24. When asked "and when you say, 'This is the way I understood it to be,' is that's [sic] how you understood it from your son," Grandmother responded "Yes." Id. at 24. On re-direct examination, when asked the reason Father gave her regarding why he was signing off on the voluntary termination, Grandmother testified "[s]o [Grandfather] would pay for his work release because that was the only way he was going to get in there with $800 that we thought that had to be paid." Id.

Grandfather testified over the telephone[5] stated that M.C., II, was currently placed with Grandfather's mother. When asked if he promised Father "anything to get him to terminate his rights," Grandfather responded "[n]o, ma'am," and when asked if had had any conversations with Father about terminating his rights, Grandfather testified "I told him numerous times that he should do the right thing because the baby is safe and secure there at my mother's" and that Father has "been in prison three times since the baby's been born." Id. at 36. When asked whether Father's allegation that Grandfather

---

[5] Grandfather testified he was currently located in Texas.

promised to pay for work release if Father signed termination paperwork was correct, Grandfather testified "No, ma'a'm [sic], that's by far not correct. If you check the history, I've paid everything for [Father] and I continue to do so to this day." Id. at 37. When asked if he promised that he would somehow allow Father to see his child, Grandfather testified "I have no control over that. That's his grandma. The thing about it is, is that's his grandma. And no matter what, [Father] will always be able to see his child." Id. Grandfather testified that Father called him the day he was signing the paperwork and that the content of the discussion was that "he needed to do the right thing because he was in no way capable of raising that child," and when asked if he made any promises to Father, Grandfather testified "No, you can't promise [Father] nothing" and "you have to look at his track record. He's gonna do the same thing, over and over and over again. Since he was 18 years old, he's been in prison five times. And he's 31 now." Id. at 37-38.

On cross-examination, Grandfather testified that he told Father that he would not pay the work release fees if Father did not have a job and that Father called him two days later to say that he had obtained a job. When asked if there had been any conversation where Father stated he would not be accepted to work release unless Grandfather funded him some initial money, Grandfather answered that Father first asked him for $1,200 and later for $800, that he had called the work release program himself because he did not believe Father, and that he was told Father "needed $240 to get in and some money to eat on for the first week until he got a paycheck. So I sent $300 to [Grandmother]." Id. at 39. When questioned regarding whether he asked anything in return for the money,

9

Grandfather stated "No. . . . I never ask my kids for nothing." Id. at 40. When asked if there were any discussions before he provided the money for work release between Father and him about Father voluntarily terminating his parental rights, Grandfather testified: "I told him for the last three or four years, five years, every time that he comes out of prison, that he needs to do the right thing and let that baby stay right there with his grandma where he has a secure stable environment. And that's what I tell him. He needs to do the right thing. The baby's where he needs to be. He's where he's happy and he's where he's been for almost seven years of his life." Id. at 40. When asked if he made any specific representations to Father regarding seeing M.C., II, Grandfather stated "What I've told [Father] numerous times is, he's in in a win/win situation here. The baby's in a secure environment, his grandma's got him, so I'm sure that he will be able to see him for the rest of his life. Or, you know, his grandma's not going to hold that baby away from him." Id. When asked if that issue was ever brought up in conjunction with signing off on a voluntary termination, Grandfather answered "No, sir." Id. at 42. The court asked Grandfather "did you say anything about, 'If you want me to pay to get you into work release, you have to sign the termination of your rights,'" and Grandfather testified: "No sir. That never came into play at all. No, that never came into the conversations at all. At all. . . ." Id. at 44.

Jason Holt testified that he worked for DCS, that he spoke with Father on the phone and Father stated he would be willing to sign a voluntary termination only if Great Grandmother was adopting M.C., II, and that he explained to Father that he could not promise that would occur but that "would be the direction [he] would be pushing." Id. at

10

46. Holt indicated that Father had been represented by an attorney in the underlying CHINS action and the prior termination action, that his department had contacted the attorney with respect to meeting with Father, that the attorney had sent Holt an e-mail message that it was not necessary for the attorney to be present, and that Holt and a notary met with Father at the time Father signed his consent to the termination. Holt testified that Father stepped out into the hallway to talk with Grandfather on the phone and that, after signing the paperwork, Father "never said that he wanted to take it back but he was visibly upset about it." Id. at 48.

Father was called to the stand again and testified that he had called Grandfather to tell him that he was "going to be going back to jail because [he was] not going to be able to afford work release." Id. at 58. According to Father, Grandfather stated "if you're going to be going back to jail, they'll probably be terminating your parental rights," that "you need to get down there and sign papers so he stays with [Great Grandmother]," that "[r]ight now, with it being open like it is, [M.C., II's mother] still has . . . can still try to get back in the picture," and "[i]f you'll just go down there and get them paper's [sic] signed, I'll pay for your work release." Id. Father also testified that he told Holt "I don't want to do this" and "I need to call my father." Id. Father indicated that he still wanted "to be able to have a chance to get back into my son's life whenever I get myself straightened out" and that he thought Grandfather was giving him that opportunity if he signed off on the termination. Id. at 59. When asked "[w]hy did you think he had that kind of power," Father testified "My father's got influence. I didn't think that he would lie to me about my grandmother. That's one of our things, that we would never lie to

11

each other. I never lied to my grandmother. My grandmother don't lie to me" and "My dad don't lie to my grandmother. My dad lies to everybody but my grandmother. Because that's his mother. My dad's a con man and that's what he does. That's his business. He hustles people out of money in a construction company." Id.

Following the hearing, Father and DCS filed briefs with the trial court in support of and objecting to Father's motion to set aside the termination order, respectively. Father argued in his brief that he had testified at the hearing that he was coerced to execute paperwork to voluntarily terminate his parental rights based on representations made to him by Grandfather and that Grandfather's representations were patently fraudulent. Father argued that, "[b]ut for the promise of the work release payments and a continuing relationship with his son, [he] would not have executed any voluntary termination documents." Appellant's Appendix at 17. DCS argued in its brief that the alleged agreement between Father and Grandfather amounts to a side agreement, that the "agreement is wholly separate and apart from [F]ather's voluntarily relinquishment," and that the agreement did not involve DCS as a party. Id. at 19. DCS further argued that, "[a]ssuming *arguendo*, that the alleged side agreement fraudulently induced [F]ather to execute the Voluntary Relinquishment, the agreement was illegal and against public policy" and "unenforceable as a matter of law." Id.

On November 13, 2012, the court entered an order denying Father's motion to set aside the termination. The court found that a parent must show, pursuant to Ind. Code § 31-35-1-7(c)(1),[6] that fraud or duress was present when the written consent was given to

---

[6] Ind. Code § 31-35-1-7(c) provides:

12

induce the execution of the voluntary consent and that in this case the alleged fraud was attributed to statements by Grandfather that Grandfather would pay for all of Father's work release financial obligations, and that Father would continue to be allowed by Great Grandmother to have a relationship with the minor child. The court found that Father's claim of fraud fails on the grounds that the statements were not made by a person in control of the termination or adoption and thus it was not reasonable to rely on representations made by Grandfather, that in order to be fraudulent the statement must be made with intent to deceive and there was no evidence Grandfather did not believe the representations he made, and that in order to constitute fraud the misstatements must concern statements of past or existing fact and not future events or opinions.

Father initially filed a notice of appeal on February 1, 2013, with respect to the November 13, 2012 order. However, on April 29, 2013, Father filed a motion for voluntary dismissal of the appeal without prejudice, due to the possible procedural "pitfalls" of the untimely request for an appeal, for the purpose of possibly filing a motion for relief from judgment. Appellant's Appendix at 36. On May 9, 2013, this court entered an order denying the motion for voluntary dismissal but ordering the appeal to be temporarily stayed, the cause be remanded to the trial court, and Father to file a

---

If there is any competent evidence of probative value that:

(1)      fraud or duress was present when the written consent was given; or
(2)      a parent was incompetent;

the court shall dismiss the petition or continue the proceeding.

13

motion for relief from judgment pursuant to Trial Rule 60 with the trial court within

fifteen days.[7]

On May 21, 2013, Father filed a motion for relief from judgment pursuant to Trial

Rule 60 with the trial court.  In the motion, Father argued that, pursuant to subsections (3)

and (8) of Rule 60(B), he believed there were several issues which justify overturning the

court's decision and setting the matter for trial on the involuntary termination of his

parental rights.  Father argued that the court "did not fully explore his actual belief when

the alleged fraud occurred."  Id. at 43-44.  Father asserted: "The termination was not

entered by a full hearing on the merits of termination.  The termination was entered on a

mere technicality without the full benefit of a hearing concerning all of the issues of

termination mentioned in I.C. 31-35-4;[8] whether or not there is a reasonable probability

---

[7] This court ordered "the trial court is directed to hold a hearing and/or issue any necessary ruling on [Father's] Motion for Relief from Judgment."  Appellant's Appendix at 41.

[8] Ind. Code §§ 31-35-4 relates to the admissibility of child videotape testimony.  Ind. Code §§ 31-35-1 relates to the voluntary termination of a parent-child relationship by the parent, and Ind. Code § 31-35-1-4 provides in part that a petition for voluntary termination must allege that:

    (A)     the parents are the child's natural or adoptive parents;
    (B)     the parents, including the alleged or adjudicated father if the child was born out of wedlock:
          (i)     knowingly and voluntarily consent to the termination of the parent-child relationship; or
          (ii)    are not required to consent to the termination of the parent-child relationship under section 6(c) of this chapter;
    (C)     termination is in the child's best interest; and
    (D)     the petitioner has developed a satisfactory plan of care and treatment for the child.

Ind. Code § 31-35-2-4 sets forth the requirements of a petition to terminate the parent-child relationship involving a child in need of services and provides that the petition must allege in part:

    (B)     that one (1) of the following is true:
          (i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

14

that conditions that resulted in the child's removal or the reasons for placement outside of the home of the parents will not be remedied or that the continuation of the parent-child relationship poses a threat to the well-being of the child, that termination is in the best interests of the child, and that there is a satisfactory plan for the care and treatment of the child." Id. at 44. Father further argued that "[t]he parent-child relationship is such a fundamental relationship that ending it, without the benefit of a hearing concerning all of the issues of termination, is tantamount to denying a parent their constitutional rights" and that the fact that Father "executed the voluntary termination documents without the advice of legal counsel should be a giant red flag in this case." Id.

On June 24, 2013, the trial court entered an order denying Father's motion for relief from judgment which stated in part that:

> This matter comes on by virtue of [Father's] Motion for Relief from Judgment. The court notes that from the underlying CHINS case out of which this voluntary petition to terminate parental rights arose, a previous involuntary petition to terminate parental rights had been filed by DCS under Cause No. 84C01-0910-JT-1266 and was denied by the court in an order dated October 27, 2011, following a factfinding hearing. In its order denying the termination of [Father's] parental rights, the court stated that it felt that guardianship would be a permanency option that would best further the child's best interests.
>
> While DCS evidently took no action to establish a guardianship over the minor child before Father was offered a voluntary termination of parental rights, the record revealed no evidence of fraud, coercion or duress which might vitiate the voluntariness of the Father's voluntary consent to

---

|       |       |                                                                                                                           |
| ----- | ----- | ------------------------------------------------------------------------------------------------------------------------- |
|       | (ii)  | There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child. |
|       | (iii) | The child has, on two (2) separate occasions, been adjudicated a child in need of services;                               |
| (C)   |       | that termination is in the best interests of the child; and                                                               |
| (D)   |       | that there is a satisfactory plan for the care and treatment of the child.                                                |

15

termination. Therefore, the court finds that Father's motion for relief from judgment should be denied.

Appellant's Appendix at 45.

Father filed a status report with this court on July 8, 2013, and following this court's dismissal of the appeal on August 7, 2013, the Indiana Supreme Court ordered the appeal be reinstated on January 17, 2014.[9]

## DISCUSSION

The issue is whether the trial court erred in denying his motion for relief from judgment. A grant of equitable relief under Ind. Trial Rule 60 is within the discretion of the trial court. Wagler v. West Boggs Sewer Dist., Inc., 980 N.E.2d 363, 371 (Ind. Ct. App. 2012), reh'g denied, trans. denied, cert. denied, 134 S. Ct. 952 (2014). We review a trial court's ruling on Rule 60 motions for abuse of discretion. Id. An abuse of discretion occurs when the trial court's judgment is clearly against the logic and effect of the facts and inferences supporting the judgment for relief. Id. When reviewing the trial court's determination, we will not reweigh the evidence. Id. Ind. Trial Rule 60(B) affords relief in extraordinary circumstances which are not the result of any fault or negligence on the part of the movant. Id. at 371-372. On a motion for relief from judgment, the burden is on the movant to demonstrate that relief is both necessary and just. Id. at 372. A trial court must balance the alleged injustice suffered by the moving party against the interests of the party who prevailed and society's interest in the finality of judgment. Id.

---

[9] Father initially filed a status report on June 28, 2013, a notice of defect was mailed, and Father filed a corrected status report on July 8, 2013. After Father filed his corrected status report, this court dismissed the appeal on August 7, 2013, for failure to file a notice of appeal and denied Father's petition for rehearing. Father filed a petition for transfer, and in an order on January 17, 2014, the Indiana Supreme Court noted it appeared Father complied with this court's order, granted transfer, reinstated the appeal, and remanded the case to this court for further proceedings expressing no opinion on the merits.

16

Ind. Trial Rule 60(B) provides in part that "[o]n motion and upon such terms as are just the court may relieve a party or his legal representative from a judgment, including a judgment by default, for the following reasons: . . . (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; . . . or (8) any reason justifying relief from the operation of the judgment, other than those reasons set forth in sub-paragraphs (1), (2), (3), and (4)." A movant filing a motion for reasons (3) and (8) must allege a meritorious claim or defense. Trial Rule 60(B). With respect to the requirement that the movant establish a meritorious claim or defense, a meritorious defense for the purposes of Rule 60(B) is "one that would lead to a different result if the case were tried on the merits." Wagler, 980 N.E.2d at 372 (citation omitted); see also Baxter v. State, 734 N.E.2d 642, 646 (Ind. Ct. App. 2000) ("A meritorious defense is one demonstrating that, if the case was retried on the merits, a different result would be reached."). A motion for relief from judgment under Rule 60(B) is not a substitute for a direct appeal. In re Paternity of P.S.S., 934 N.E.2d 737, 740 (Ind. 2010). Trial Rule 60(D) provides: "In passing upon a motion allowed by subdivision (B) of this rule the court shall hear any pertinent evidence, allow new parties to be served with summons, allow discovery, grant relief as provided under Rule 59 or otherwise as permitted by subdivision (B) of this rule."

The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. In re I.A., 934 N.E.2d 1127, 1132 (Ind. 2010). "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty issues.'" Id. (quoting

Troxel v. Granville, 530 U.S. 57, 65, 120 S. Ct. 2054 (2000)). "Indeed[,] the parent-child relationship is 'one of the most valued relationships in our culture.'" Id. (quoting Neal v. DeKalb Cnty. Div. of Family & Children, 796 N.E.2d 280, 285 (Ind. 2003)). Nevertheless, parental rights are "not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights." Id. (citing In re D.D., 804 N.E.2d 258, 264-65 (Ind. Ct. App. 2004), trans. denied). Thus, parental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities. Id.

The voluntary termination of the parent-child relationship is controlled by Ind. Code §§ 31-35-1. Ind. Code § 31-35-1-4 provides in part that a petition for voluntary termination must allege that:

(a)　If requested by the parents:

(1)　the local office; or

(2)　a licensed child placing agency;

may sign and file a verified petition with the juvenile or probate court for the voluntary termination of the parent-child relationship.

(b)　The petition must:

\* \* \* \* \*

(2)　allege that:

(A)　the parents are the child's natural or adoptive parents;

(B)　the parents, including the alleged or adjudicated father if the child was born out of wedlock:

18

> > > (i) knowingly and voluntarily consent to the termination of the parent-child relationship; or
> >
> > > (ii) are not required to consent to the termination of the parent-child relationship under section 6(c) of this chapter;
> >
> > (C) termination is in the child's best interest; and
> >
> > (D) the petitioner has developed a satisfactory plan of care and treatment for the child.

Ind. Code § 31-35-1-6(a) provides:

> Except as provided in subsection (c), the parents must give their consent in open court unless the court makes findings of fact upon the record that:
>
> > (1) the parents gave their consent in writing before a person authorized by law to take acknowledgments; and
> >
> > (2) the parents were:
> >
> > > (A) advised in accordance with section 12 of this chapter; and
> > >
> > > (B) advised that if they choose to appear in open court, the only issue before the court is whether their consent was voluntary.

Ind. Code § 31-35-1-7(c) provides: "If there is any competent evidence of probative value that: (1) fraud or duress was present when the written consent was given; or (2) a parent was incompetent; the court shall dismiss the petition or continue the proceeding." Ind. Code § 31-35-1-10(a) provides that "[i]f [] the court determines that the allegations in the petition described in section 4 of this chapter are true; and [] the other requirements of this article are met; the court shall terminate the parent-child relationship."

19

Father challenges the denial of his motion for relief from judgment on several bases.

A.     The October 2, 2012 Hearing and Due Process

We first address Father's assertions that reversal is warranted because the trial court did not hold a hearing on his motion for relief from judgment and on the grounds that his due process rights were violated and that he could not waive notice of the termination hearing. DCS maintains that Father was provided a hearing on the merits of his arguments and there was no need for the trial court to conduct a hearing on Father's motion for relief from judgment, that Father had a statutory right to and did waive notice of the termination hearing, and that Father cannot demonstrate harm because the court provided him with a hearing on the issue of his consent.

We observe that, while the trial court did not hold a hearing following the filing of his May 21, 2013 motion for relief from judgment, the court did hold a full hearing on Father's claims at the hearing on his motion to set aside the termination order on October 2, 2012, at which he was afforded the opportunity to present any pertinent evidence, and did so, in support of his claims. Specifically, as set forth above and in the record, Father had the opportunity to present, and the court had the opportunity to elicit, any pertinent evidence related to Father's claim that Grandfather promised to pay his work release fees and to permit Father to visit M.C., II, if Father consented to the voluntary termination of his parental rights and the impact of these alleged promises on the voluntariness of Father's consent. The court had the opportunity to consider the testimony of Father, Grandmother, Grandfather, and Jason Holt and to ask questions of the witnesses. Father

20

does not point to other evidence or testimony he would have presented at a subsequent hearing which he did not present or was unable to present at the October 2, 2012 hearing. Father received a fair and thorough hearing on his request that his consent and the June 19, 2012 termination order be set aside. Moreover, the claims and allegations raised by Father in his motion for relief from judgment were the same as those raised in his motion to set aside judgment. Because Father's evidence was before the court, the court was not required to hold another hearing prior to ruling on Father's motion for relief from judgment.[10] See Thompson v. Thompson, 811 N.E.2d 888, 904 (Ind. Ct. App. 2004) (noting that Trial Rule 60(D) generally requires trial courts to hold a hearing on any pertinent evidence before granting Trial Rule 60(B) relief, but that when there is no pertinent evidence to be heard, a hearing is unnecessary) (citing Pub. Serv. Comm'n v. Schaller, 157 Ind. App. 125, 130, 299 N.E.2d 625, 628 (1973) (noting that the language of Rule 60(D) is mandatory but only for the presentation of "pertinent evidence")), reh'g denied, trans. denied.

We also find, with respect to Father's argument that his due process rights were violated, that Father waived notice of further termination proceedings, see Appellant's Appendix at 8 (the Consent to Voluntary Termination of Parental Rights and Waiver of Notice of Hearing signed by Father stated that he would "not receive notice of the termination of parent-child relationship proceeding or adoption proceeding"), and that

---

[10] Also, to the extent Father suggests the trial court did not comply with this court's May 9, 2013 order, we note that our order stated that the trial court was "directed to hold a hearing and/*or* issue any necessary ruling on [Father's] Motion for Relief from Judgment." Appellant's Appendix at 41 (emphasis added).

21

such waiver is expressly contemplated by Ind. Code § 31-35-1-5(b).[11]  In addition, even if Father's waiver was invalid, the trial court nevertheless subsequently conducted a thorough hearing on October 2, 2012, on Father's contention that his consent was not voluntarily given at which Father presented pertinent evidence.  See Ind. Code § 31-35-1-6(a).  Father cannot demonstrate he was denied due process by virtue of a lack of notice.

B.      The Trial Court's Determination Father's Consent was Voluntary

We next turn to Father's arguments that the trial court erred in its determination that his consent to the termination of his parental rights was executed under fraud or duress.  "The issue of an invalid consent may be raised by a petition to withdraw consent, and the burden of proof in such a matter falls on the petitioner."  Youngblood v. Jefferson

---

[11] Ind. Code § 31-35-1-5(b) provides:

A parent who has made a valid consent to the termination of a parent-child relationship may waive the notice required by subsection (a) if the waiver:

    (1)     is in writing either:

         (A)    in the parent's consent to terminate the parent-child relationship; or
         (B)    in a separate document;

    (2)     is signed by the parent in the presence of a notary public; and

    (3)     contains an acknowledgment that:

         (A)    the waiver is irrevocable; and
         (B)    the parent will not receive notice of:
              (i)     adoption; or
              (ii)    termination of parent-child relationship;
             proceedings.

As discussed below, we do not disturb the trial court's ruling regarding the validity of Father's consent. To the extent Father cites Ind. Code § 31-35-1-12 in support of his argument that he cannot waive his right to receive notice of the hearing, Ind. Code § 31-35-1-12(8) provides that parents "will receive notice of the hearing, *unless notice is waived under section 5(b) of this chapter*, at which the court will decide if their consent was voluntary, and the parents may appear at the hearing and allege that the consent was not voluntary." (Emphasis added).

22

Cnty. Div. of Family & Children, 838 N.E.2d 1164, 1168 (Ind. Ct. App. 2005) (citation omitted), trans. denied. A parent's ability to withdraw his consent to the termination of his parental rights is extremely limited. Id. at 1169. A parent who executes a voluntary relinquishment of parental rights is bound by the consequences of such action, unless the relinquishment was procured by fraud, undue influence, duress, or other consent-vitiating factors. Id. If there is any competent evidence of probative value that fraud or duress was present when the written consent was given, the trial court shall dismiss the petition or continue the proceeding. Id. (citing Ind. Code § 31-35-1-7(c)).

    1.    Fraud

Father argues that his consent was obtained by fraud because he believed he would be able to see M.C., II, through Great Grandmother. DCS maintains that there is no argument that DCS, as the adverse party, committed any fraud and that Grandfather denied making the alleged statements promising that Father would be able to see M.C., II, if he terminated his parental rights. DCS argues that Grandfather had been telling Father that he should let Great Grandmother have M.C., II, for the past several years, that Father has failed to show Grandfather made false statements or made any statements in an intentional or reckless manner, and thus that Father cannot demonstrate fraud.

The elements of actual fraud are: (1) material representation of past or existing facts by the party to be charged; (2) which was false; (3) which was made with knowledge or reckless ignorance of the falseness; (4) was relied upon by the complaining party; and (5) proximately caused the complaining party injury. Id. at 1169-1170.

23

Father testified at length at the October 2, 2012 hearing and had the opportunity to present evidence in support of his claims. The trial court heard the testimony of Father, Grandmother, Grandfather, and Jason Holt, as set forth above and in the record, and determined in its November 13, 2012 order that it was unreasonable for Father to rely on representations of Grandfather, and that there was no evidence Grandfather did not believe the representations he made. In its denial of Father's motion for relief from judgment, the court determined the record revealed no evidence of fraud which might vitiate the voluntariness of the Father's voluntary consent to termination. When Grandfather was asked if the issue of seeing M.C., II, was ever brought up in conjunction with signing off on a voluntary termination, Grandfather answered "No, sir." October 2, 2012 Transcript at 42. Jason Holt testified that Father stated he would be willing to sign a voluntary termination only if Great Grandmother was adopting M.C., II, and that he explained to Father that he could not promise that would occur, but that it "would be the direction [he] would be pushing." Id. at 46. The trial court was in a position to hear the testimony of Father, Grandfather, and the other witnesses and to determine their credibility and weigh the evidence. See Campbell v. Campbell, 993 N.E.2d 205, 211 (Ind. Ct. App. 2013) (noting the trial court is in a position to see the parties, observe their conduct and demeanor, and hear their testimony), trans. denied; Grant v. Grant, 141 Ind. App. 521, 526, 230 N.E.2d 339, 343 (1967) (noting that a trial judge is in a position to observe the parties, hear their testimony from the witness stand, observe their conduct and demeanor, and determine their credibility and weigh the evidence). We also note, as

24

the trial court found, that proof of fraud requires the misrepresentation of a past or existing fact and not a promise of future performance.

Based on our review of the record, we cannot say the trial court erred in finding that Father's consent was not obtained by fraud. See Youngblood, 838 N.E.2d at 1170 (mother failed to show that her consent to terminate was obtained by fraud) (citing In re Termination of the Parent-Child Relationship of Infant Ellis, 681 N.E.2d 1145, 1151 (Ind. Ct. App. 1997) (the mother failed to establish her consent was obtained by fraud), trans. denied, abrogated on other grounds by Neal, 796 N.E.2d 280).

2.      Duress

Father also claims that his consent was obtained under duress because Grandfather offered to pay for his work release and the alternative would be to go to prison. DCS maintains that Father's argument is premised on his own testimony and is a request for this court to reweigh the evidence. DCS argues that Grandfather historically paid Father's fees and that Grandfather repeatedly testified he did not promise to pay the fees in exchange for Father's consent.

> [I]n order to avoid a contract on the basis of duress, there must be an actual or threatened violence of restraint of a man's person contrary to law, to compel him to enter into a contract or discharge one. In deciding whether a person signed a document under duress, the ultimate fact to be determined is whether or not the purported victim was deprived of the free exercise of his own will. . . .  [E]motions, tensions, and pressure are . . . insufficient to void a consent unless they rise to the level of overcoming one's volition.

Youngblood, 838 N.E.2d at 1170 (citations and internal quotation marks omitted).

Father does not argue there was any evidence of threatened violence or physical restraint to him. While he testified regarding his emotional condition at the time he

25

executed the consent, emotions and tensions do not invalidate a consent "unless they rise to the level of overcoming one's volition." Id. As noted above, Father testified at length at the October 2, 2012 hearing, and the court heard the testimony of Father, Grandmother, and Grandfather, and in its denial of Father's motion for relief from judgment, the court determined the record revealed no evidence of duress which might vitiate the voluntariness of Father's voluntary consent to termination. When asked whether Father's allegation that Grandfather promised to pay for work release if Father signed termination paperwork was correct, Grandfather testified "No, ma'a'm [sic], that's by far not correct. If you check the history, I've paid everything for [Father] and I continue to do so to this day." October 2, 2012 Transcript at 37. When questioned regarding whether he asked anything in return for the money for work release fees, Grandfather stated "No. . . . I never ask my kids for nothing." Id. at 40. When asked if there were any discussions before he provided the money for work release between father and him about Father voluntarily terminating his parental rights, Grandfather testified: "I told him for the last three or four years, five years, every time that he comes out of prison, that he needs to do the right thing and let that baby stay right there with [Great Grandmother]." Id. The court asked Grandfather "did you say anything about, 'If you want me to pay to get you into work release, you have to sign the termination of your rights,'" and Grandfather testified: "No sir. That never came into play at all. No, that never came into the conversations at all. At all. . . ." Id. at 44. The trial court was in a position to assess the testimony of Father and Grandfather and their credibility, and to weigh the evidence.

Father has failed to show that his free will was overcome at the time he executed the consent. Thus, he has not demonstrated his consent to terminate his parent-child relationship with M.C., II, was obtained by duress, and the court did not err in denying his motion for relief from judgment. See Youngblood, 838 N.E.2d at 1170-1171 (holding that mother failed to show that her free will was overcome when she signed the consent, that accordingly she failed to show that her consent to terminate was obtained by duress, and that the court did not err by denying her petition to set aside her consent on the basis of duress).

CONCLUSION

Father has failed to demonstrate that he was denied a fair hearing or that his consent to terminate his parent-child relationship with M.C., II, was executed under fraud or duress. We cannot say the trial court erred in denying his motion for relief from judgment.

For the foregoing reasons, we affirm the rulings of the trial court and the termination of Father's parental rights.

Affirmed.

VAIDIK, C.J., and NAJAM, J., concur.