**In the Matter of the Termination of the Parent–Child Relationship of M.R., N.R., J.P. & K.P., Minor Children,**

**and**

**Kimberly (Reichelt) Hudgens, Appellant–Respondent,**

**v.**

**Wells County Division of Family and Children, Appellee–Petitioner.**

No. 90A05–9912–JV–575.

Court of Appeals of Indiana.

May 5, 2000.

Douglas E. Ulmer, Fort Wayne, Indiana, Attorney for Appellant.

Ned R. Carnall, Andrew J. Carnall, Bluffton, Indiana, Attorneys for Appellee.

## OPINION

KIRSCH, Judge

Kimberly (Reichelt) Hudgens appeals the trial court's order terminating her parent-child relationship with her four minor children. We restate the issue for consideration as follows:

Whether the State must present clear and convincing evidence that the termination is in the best interests of the children and that the State has a satisfactory plan for the care and treatment of the children when the natural parent voluntarily relinquished her parental rights.

We affirm.

## FACTS AND PROCEDURAL HISTORY

Hudgens is the natural mother of four children: K.P. born May 17, 1985, J.P. born December 25, 1986, M.R. born September 4, 1991, and N.R. born August 8, 1992. The natural father of K.P. is Joseph Padden, the natural father of J.P. is Steve Lawrence, and the natural father of M.R. and N.R. is Harvey Reichelt.[1]

On November 16, 1996, the Wells County Office of Family and Children ("OFC") removed N.R. and M.R. from their parental home.[2] On December 5, 1996, they were designated children in need of services ("CHINS") pursuant to the admission of the parents and order of the court. Thereafter, on February 18, 1997, the court determined M.R. and N.R. to be wards of OFC. On December 6, 1996, OFC removed the two older children, J.P. and K.P., from their home. On February 18, 1997, the trial court adjudicated both J.P. and K.P. as CHINS. All four children have been removed from the home of their custodial parents continuously since December 6, 1996. *Record* at 21 (M.R.), 11(N.R), 11 (J.P.), 11 (K.P.).[3]

On April 2, 1998, the OFC filed four petitions for involuntary termination of Hudgens's parental rights, one for each of her children. The petitions alleged, respectively, that: "Termination of the parent-child relationship is in [the child's] best interest" and "There is a satisfactory plan for the care and treatment of each child, in that [the child] can continue in foster care until the adoptive placement is made available." *Record* at 21(M.R.), 11 (N.R.), 11 (J.P.), 11 (K.P.).

On May 27, 1998, at the initial hearing on the petitions, Hudgens appeared and requested court-appointed counsel. The court granted her request and appointed counsel to represent her in the termination proceedings. According to the court's order of that date, Hudgens was advised of her rights in connection with the termination proceedings. *Record* at 100 (M.R.), 86 (N.R.), 97 (J.P.), 90 (K.P.).

On July 13, 1999, at a status hearing on the termination petitions, Hudgens appeared with counsel.[4] At the beginning of the hearing, Hudgens, by counsel, presented the court with signed Voluntary Relinquishment and Termination of Parental Rights; Waiver of Notice and Consent to Judgment and Decree ("Consent") for each of her four children. The four Consents were identical, except for the child's name and gender references, and read as follows:

"The undersigned, KIMBERLY M. REICHELT, natural mother of [child's name] hereby says that:

1. KIMBERLY M. REICHELT is the mother and natural guardian of

---

1. OFC's petition to terminate Hudgens's parental rights to J.P. and K.P. alleged that Joseph Padden's parental rights also should be terminated. On August 2, 1999, the trial court terminated Padden's parental rights to both children. However, prior thereto, on July 13, 1999, Hudgens testified that a paternity blood test had been conducted, and that Steve Lawrence, not Joseph Padden, was the father of J.P. *Record* at 15. OFC's petition to terminate Hudgens's parental rights to M.R. and N.R. alleged that Harvey Reichelt's parental rights also should be terminated; the trial court dismissed that part of the petition relative to Harvey Reichelt.

2. We note that the Record does not provide us with information concerning from whose home the children were removed, nor the reasons for the removal.

3. We note that in this appeal there are four Records of Proceedings, as each of the four children had a separate trial court cause number for his or her case. We will refer to the various Records by the child's initials, rather than by the lower court cause number assigned to that child.

4. During the course of the termination proceedings, in January 1999, Hudgens was sentenced to two concurrent four-year terms with two suspended terms at the Indiana Department of Corrections pursuant to a conviction for fraud on a financial institution. Her earliest possible release date was July 28, 1999. *Record* at 62 (M.R.), 28 (N.R.), 54 (J.P.), 44 (K.P.).

[child's name] and thereby authorized to execute this Relinquishment and Waiver and Consent.

2. She is aware that the Wells County Office of Family and Children did on April 2, 1998, file a Petition to Terminate the Parent Child Relationship between her and [child's name], and that she has read the Petition and understands it and the nature of the request.

3. She hereby releases, relinquishes and foregoes all her rights of parenthood and as parent of [child's name] does hereby consent absolutely and unconditionally to the termination of the parent-child relationship between her and [child's name].

4. She hereby further waives notice of any further filings and hearings in connection with these proceedings.

5. She hereby consents to the entry of a judgment or decree by the Wells Circuit Court terminating the parent-child relationship between her and [child's name].

6. She hereby agrees to appear in the Wells Circuit Court at 10:00 o'clock a.m. on the 13 day of July, 1999, and under oath give her consent to the termination of the parent-child relationship between her and [child's name].

Signed at Bluffton, Indiana, this 13 day of July, 1999.

/s/ Kimberly Reichelt (Hudgens)"

Record at 19–20 (M.R.), 9–10 (N.R.), 9–10 (J.P.), 9–10(K.P).

Upon direct examination by OFC's counsel, Hudgens identified each of the four Consents as being a voluntary relinquishment of her parental rights, which she had signed that morning after discussion with her attorney. Record at 11–14 (M.R.).[5] Hudgens testified that she understood the effect of the document upon her parental rights, duties, and responsibilities. Record at 11–14 (M.R.). She testified that no one

made any promises or threats in order to induce her to sign the Consents. Record at 14 (M.R.). Hudgens acknowledged that she would have no further rights to or responsibilities for her children, and that, in all likelihood, they would be adopted. Record at 14 (M.R.).

Upon examination by her own counsel, Hudgens affirmed that she had taken no medication that day, including any that would affect her understanding of the proceedings. Record at 14 (M.R.). She further testified that she understood there was a trial scheduled on the petitions for involuntary termination of her parental rights, and that she chose not to proceed with trial, instead electing "this course of action." Record at 15 (M.R.). Following Hudgens's testimony, the court continued the hearing, pending submission of a proposed order voluntarily terminating the parental rights of Hudgens as to the four children. Record at 15 (M.R.).

Thereafter, on August 2, 1999, the court issued orders terminating Hudgens's parental rights to J.P. and K.P. On September 1, 1999, the court likewise terminated Hudgens's parental rights with respect to M.R. and N.R. Hudgens now appeals.

## DISCUSSION AND DECISION

 In reviewing termination proceedings on appeal, this court will not reweigh the evidence nor assess the credibility of witnesses. In re L.S., 717 N.E.2d 204, 208 (Ind.Ct.App.1999), trans. denied (2000). We consider only the evidence that supports the trial court's decision and the reasonable inferences to be drawn therefrom. Id. In deference to the trial court's unique position to assess the evidence, we set aside the judgment terminating a parent-child relationship only if it is clearly erroneous. Id. If the evidence and inferences support the trial court's decision, we must affirm. Id.

---

5. The transcript of the July 13, 1999 hearing appears only in the Record of Proceedings for

M.R. but concerns the Consents for termination of parental rights to all four children.

■ To effect the involuntary termination of a parent-child relationship, the State must present clear and convincing evidence to establish, among other things, that the termination of the parental rights is in the best interest of the child and that there exists a satisfactory plan for the care and treatment of the child. IC 31–35–2–4(b)(2)(C), (D); *see id.* Hudgens contends that the OFC failed to satisfy these two requirements and that, therefore, the trial court erred when it terminated Hudgens's parent-child relationship with her children. Given the procedural circumstances of this case, Hudgens's argument is misplaced.

Hudgens's assertion stems from her misapprehension that IC 31–35–2–4 is the exclusive statutory means to terminate parental rights. *Appellant's Brief* at 15. To the contrary, the Indiana Code provides three independent processes to terminate parental rights: IC 31–35–1–1 to 31–35–1–12 govern voluntary termination proceedings, IC 31–35–2–1 to 31–35–2–8 govern involuntary termination proceedings involving a delinquent child or child in need of services, and IC 31–35–3–1 to 31–35–3–9 govern involuntary termination proceedings with individuals convicted of certain criminal offenses.

Without question, this case began as an involuntary proceeding, pursuant to OFC's petitions for involuntary termination of parental rights.[6] However, the case became a voluntary termination proceeding upon Hudgens's filing of the four Consents, each entitled Voluntary Relinquishment and Termination of Parental Rights; Waiver of Notice and Consent to Judgment and Decree. *See In re M.S,* 551 N.E.2d 881, 883 (Ind.Ct.App.1990), *trans. denied, cert. denied,* 498 U.S. 1121, 111 S.Ct. 1075, 112 L.Ed.2d 1181 (1991) (where case arose under a petition for involuntary termination of parental rights, hearing's purpose changed when mother signed consent forms to relinquish her parental rights).

Once the posture of this case changed from involuntary to voluntary, the voluntary termination statutes, IC 31–35–1–1 to 31–35–1–12, thereafter controlled the proceedings.

■ We find no support for the proposition that where, as here, a parent offers a voluntary consent to the termination of her parental rights, the State must nonetheless prove the allegations of its petition by clear and convincing evidence. We analogize this case to the defendant in a criminal case who enters a voluntary plea of guilty, and the case never reaches trial. Under those circumstances, the State is not required to prove beyond a reasonable doubt that the defendant committed the alleged crime. Similarly, we conclude that where a parent has freely and voluntarily executed a relinquishment of her parental rights, the State is relieved of the clear and convincing standard of proof, which remains necessary to effect an involuntary termination of the parent-child relationship.

Notably, termination proceedings pursuant to a parent's consent remain subject to the safeguards outlined in the statutes governing voluntary termination of parental rights. For instance, the parent must give her consent in open court, unless the court makes certain findings upon the record concerning the parent's absence and the circumstances under which she gave prior written consent. IC 31–35–1–6. To further assure the voluntariness of the consent, the court must advise the parent of her constitutional and other legal rights, as well as other rights enumerated in the voluntary termination statutes. IC 31–35–1–8; IC 31–35–1–12.

In this case, Hudgens had notice of the July 13, 1999 hearing and appeared with counsel. The four executed Consents were filed with the court, and Hudgens individually identified her signature on each. She

---

**6.** OFC's petitions do not refer to the statute under which it seeks to terminate Hudgens's parental rights. However, the allegations re- cited in the petitions are those outlined in IC 31–35–2–4, concerning termination proceedings involving a child in need of services.

testified that her consent was voluntary, and she affirmed that she understood the impact of the termination of her parental rights. When examined about the effect of the relinquishment of her parental rights as to M.R., Hudgens replied in general terms applicable to all four children, stating: "It relieves me from involvement in their lives. It leaves them where they are. Being provided with more than I can give them." *Record* at 11 (M.R.). She testified that she had spoken with her attorney "at some length" before the hearing. *Record* at 14–15 (M.R.). Hudgens verified that she was not taking any medications that would affect her understanding of the proceedings.

The court's orders of May 27, 1998, following the initial hearing, reflect that the court advised Hudgens of her rights relative to the termination proceedings. *Record* at 100 (M.R.), 86 (N.R.), 97 (J.P.), 90 (K.P.). Later, the court's orders terminating Hudgens's parent-child relationships state that her consent was given with full knowledge of her constitutional and other legal rights. *Record* at 23 (M.R.), 15 (N.R.), 13 (J.P.), 13 (K.P.). She does not make any challenge on appeal to the contrary. Nor does she assert that her consent was not voluntary or is otherwise invalid.

Yet, Hudgens now seeks reversal of the termination orders, to which she herself consented. We note that "A parent who executes a voluntary relinquishment of parental rights is bound by the consequences of such action, unless the relinquishment was procured by fraud, undue influence, duress, or other consent-vitiating factors." *Matter of Snyder,* 418 N.E.2d 1171, 1180 (Ind.Ct.App.1981). *See also* IC 31–35–1–12(1) (requiring that parent be advised that her consent is permanent and cannot be revoked or set aside unless it was obtained by fraud or duress or unless parent is incompetent).

We conclude that where the parent whose rights are being terminated volun-tarily consents to the termination, the State is relieved of its burden to prove by clear and convincing evidence that the termination is in the best interest of the child and that the State has a satisfactory plan for the care and treatment of the child. Accordingly, the trial court's orders terminating Hudgens's parent-child relationship with her four children, pursuant to her voluntary consents and her in-court testimony, were proper.

Affirmed.

BAKER, J., and RILEY, J., concur.