## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Sep 24 2015, 10:20 am

CLERK
of the supreme court,
court of appeals and
tax court

---

ATTORNEY FOR APPELLANT

Adam C. Squiller
Squiller & Harley
Auburn, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

---

# IN THE
# COURT OF APPEALS OF INDIANA

---

Matter of the Termination of the Parent-Child Relationship of R.H., Minor Child,

M.H.,

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

September 24, 2015

Court of Appeals Case No. 92A03-1502-JT-62

Appeal from the Whitley Circuit Court

The Honorable James R. Heuer, Judge

Cause No. 92C01-1404-JT-10

**Najam, Judge.**

## Statement of the Case

M.H. ("Mother") appeals the trial court's order terminating her parental rights to her daughter R.H. Mother presents a single issue for our review, namely, whether the trial court erred when it concluded that her consent to adoption and relinquishment of parental rights were voluntary. We affirm.

## Facts and Procedural History

On April 6, 2012, Mother, who was sixteen years old at the time, gave birth to R.H. R.H.'s father, D.P. ("Father"), was almost forty years old at the time of R.H.'s conception and birth. After living together for the first six months of R.H.'s life, Mother and Father terminated their illicit relationship. Mother tried to take R.H. with her when she moved out, but Father's mother intervened and prevented Mother from taking R.H. from Father's home.

On December 26, 2012, the Department of Child Services ("DCS") removed R.H. from Father's home after Father was arrested for manufacturing methamphetamine. Mother's whereabouts were unknown at that time. At a February 4, 2013, hearing, Mother appeared and admitted that she was unable to provide the necessary food, clothing, shelter, or medical care for R.H. Accordingly, the trial court adjudicated R.H. to be a child in need of services ("CHINS"). DCS placed R.H. in foster care and planned for reunification of R.H. with Mother. The trial court ordered Mother to participate in services. As a result of Father's sexual relationship with Mother, Father was convicted of child molesting, as a Class A felony; sexual misconduct with a minor, as a

Class B felony; and child seduction, a Class D felony; and he was sentenced to sixty years executed.[1]

[4] In a progress report dated August 9, 2013, the DCS case manager overseeing Mother's participation in services, Victoria Mans, stated that Mother: had found employment; was inconsistent with her visits with R.H.; had completed her intake assessment to obtain her GED; was meeting inconsistently with her Independent Living Worker and Home Based Worker; and had stopped attending her individual counseling sessions. Following a hearing on August 19, Mother informed DCS that she did not want to visit with R.H. anymore and that she was "no longer interested in having her daughter returned to her care." Appellee's App. at 69. Accordingly, DCS changed the permanency plan for R.H. from reunification with Mother to adoption. And in a progress report dated December 13, Sharon Persons, Mother's new DCS case manager, stated that Mother still had no interest in participating in services or reunification with R.H.

[5] In January 2014, Mother contacted Persons to say that she had changed her mind and that "she wanted [R.H.] returned to her and she [wanted to] start services again." Id. at 79. On February 4, 2014, a team meeting was held with Mother, Mother's fiancée, E.S., the guardian ad litem, and Mother's attorney.

---

[1] R.H. is Mother's second child with Father. Their first child was also adopted, and that adoption is not part of this appeal.

Persons advised Mother that, because she had "not been in services for six months, she [would] need to start from the beginning and complete all assessments at [the] Bowen Center and follow all recommendations this time." *Id.* Persons also advised Mother that DCS would file a termination petition, but that "nothing [would] be scheduled until it [was] seen how actively [Mother] participate[d] in the services and what she gain[ed] from them." *Id.* Further, DCS and the guardian ad litem agreed that it was not in R.H.'s best interests to start visitation with R.H. until Mother had participated in "her evaluations and services." *Id.* at 80. Persons also stated that visitation was dependent on Mother "show[ing] good faith." *Id.* Following a review hearing on February 24, the trial court ordered Mother to restart services, but the court ordered that Mother would not have visitation with R.H.

[6] On April 7, while Mother was participating in services, DCS filed a petition to terminate Mother's parental rights to R.H. In a July 11 progress report, Mother's new family case manager, Ashley Meyers, stated that Mother had completed an intake assessment at the Bowen Center and a substance abuse assessment. But Mother "did not show up" for her psychological evaluation, and she was ordered to take that evaluation "to determine what services are needed." *Id.* at 91-92. Further, the Bowen Center reported that Mother had "not fully engaged in home-based RSP services to address parenting and how to

discipline and care for a child." *Id.* at 92. The Bowen Center also reported that Mother had not attended individual therapy as recommended.[2]

[7] Meyers concluded her July 11 progress report as follows:

> [Mother] and her fiancée, [E.S.], have both had Psychological Evaluations that were deemed invalid due to either being unwilling or unable to answer questions in an honest and forthright manner. Therefore, the Bowen Center recommends they complete the assessment again. [Mother] has not fully participated in services offered to her and has not fully engaged. She tells service providers that she knows everything about parenting and discipline. [Mother] expressed in January, 2014, after DCS filed for termination, she wanted to get [R.H.] back[,] but her actions do not show she is serious in doing what is required for that to happen.

*Id.* at 93.

[8] On July 21, the trial court held a review hearing, and Mother, in person and by counsel, advised the court that she intended to voluntarily terminate her parental rights to R.H. That hearing was continued until July 28, but Mother did not appear on that date. During a hearing on August 18, Mother appeared and submitted her voluntary relinquishment of parental rights and consent to adoption. The trial court heard evidence and concluded that "termination is in the best interest of the child [and] the grounds for termination have been met."

---

[2] At some point, the trial court ordered Mother's fiancée, E.S., to participate in services.

Appellant's App. at 3. The trial court then took the matter under advisement "pending resolution" of the petition for the involuntary termination of Father's parental rights. *Id.*

On September 2, Mother filed a motion to withdraw her consent to adoption. During a hearing on that motion on November 12, Mother testified in relevant part as follows:

> A: I felt like I was forced into signing my rights over. I had a couple [of] people [who] I feel were completely against me at the Bowen Center [who] I feel what they had said was not true.
>
> * * *
>
> A: I felt like I had no other option but to sign my rights over because they were not going to give me my child back.
>
> Q: Okay. Had someone communicated to you that you were not going to get your child back?
>
> A: No.
>
> Q: Had someone said, if you don't do this, you're not going to get your child back?
>
> A: Yes.
>
> Q: Who said that?
>
> A: [DCS liaison for the Bowen Center] Corissa Robinson.
>
> * * *

Q: Okay. And, what was your relationship with her? Like, . . . why did you have to work with her?

A: I believe she was the person [who] set up all my assessments. I believe that's [what] she did.

Q: Okay. But you said that you completed those assessments.

A: Yes.

Q: And, so, then why would she communicate to you that you weren't going to get [R.H.] back?

A: At a family team meeting that we had, she . . . I feel like she was pretty much yelling at me the whole time.

Q: Okay.

A: It was all directed towards me. Like, I was in a relationship and that person[, E.S.,] did not want to participate in services, so she turned to me and started yelling at me for [E.S.] not wanting to participate in services.

Q: Okay. So the DCS Bowen Center liaison indicated to you that you weren't going to get [R.H.] back if what didn't happen?

A: If I didn't complete services that I thought I had already completed, that she did not make clear that that wasn't the whole . . . it was just the assessment. I did not complete the whole service.

* * *

A: I never wanted to sign my rights over. I never wanted to do that at all. I wanted to keep fighting. I do want my child back. I

do believe she deserves to be with her birth mother, that she should be placed with her birth mother.

Q: Okay. Do you still feel like you were forced to sign off originally?

A: Yes.

Q: Okay. But you decided . . . that you should fight for [R.H.]?

A: Yes. I decided that I should just fight for her.

Q: Okay. Is there anything else that changed in your life . . . circumstances that affected your thinking at that time?

A: I don't know. I guess. Kinda. I mean, I did break up with [E.S.]

Q: Was that breakup . . . did it have anything at all to do with whether you were making efforts to get [R.H.] back or not making efforts to get [R.H.] back?

A: Yes and no.

Q: Okay.

A: Yes, because [s]he didn't want to participate in services and I did. I still want to participate in services.

* * *

A: And, no, because it was . . . pretty much a mutual decision between both of us [that we should not be together].

* * *

Q: Did your attorney go over the Voluntary Relinquishment of Rights?

A: Yes.

Q: Did she go over the Consent to Adopt?

A: Yes.

Q: Did she tell you that you didn't have to sign off your rights?

A: Yes.

Q: But yet, you're saying here, you were forced.

A: That I still felt forced, yes.

Q: Even though your attorney told you, you didn't have to do this?

A: Yes.

Q: Did you talk to your family case manager and ask her?

A: No.

Q: Can you tell me exactly what it was that Corissa Robinson said? That you had to sign your rights off?

A: No.

Q: What did she say to you to make you feel forced?

A: She had said, like I said, in that family team meeting before we had [come] into court, that . . . if I didn't do . . . I don't remember what it was. If I didn't do this and this and this, that I

might as well just give her up anyways.  That I might as well just give her up.

Q:  So that made you think that you had to give her up?

A:  Yes.  Because . . . every time I have called her, she has made me feel like I'm a nuisance to her, like I bother her when I call her.  She's always got an attitude with me, no matter what.

* * *

Q: Okay.  So [Corissa Robinson] was rude.  But did she tell you that you had to sign your child's rights off?

A: No.  She didn't say I had to.  She said, I might as well.

* * *

Q:  Your attorney is a licensed professional.  Why didn't you believe her [that you did not have to give up your parental rights to R.H.]?

A:  I did.

Q: She told you, you didn't have to sign off your rights.

A: I know I didn't have to.

Q: So, you chose to sign off your rights?

A: Yes.

Tr. at 51-73 (emphases added).  Following the hearing, the trial court took the matter under advisement.  On January 22, 2015, the trial court entered an order

denying Mother's motion to withdraw her consent to adoption. And on February 19, the trial court entered an order terminating Mother's parental rights to R.H. This appeal ensued.

## Discussion and Decision

[10] In reviewing termination proceedings on appeal, this court will not reweigh the evidence nor assess the credibility of witnesses. *In re M.R.*, 728 N.E.2d 204, 207 (Ind. Ct. App. 2000), *trans. denied*. We consider only the evidence that supports the trial court's decision and the reasonable inferences to be drawn therefrom. *Id.* In deference to the trial court's unique position to assess the evidence, we set aside the judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* If the evidence and inferences support the trial court's decision, we must affirm. *Id.*

[11] Mother contends that, because her consent to adoption and relinquishment of parental rights were procured under duress, the trial court clearly erred when it terminated her parental rights. The State alleges that Mother has waived these issues on appeal. In particular, the State points out, correctly, that Mother never argued to the trial court that her relinquishment of parental rights was procured under duress. Mother only moved the trial court to withdraw her consent to adoption.[3] And, on appeal, while Mother included the trial court's

_____

[3] While a parent's relinquishment of parental rights and consent to adoption are obviously intertwined, each is governed by a distinct statute and is treated as a separate issue. *See, e.g.*, *Matter of Adoption of Konar*, 454

order denying her motion to withdraw her consent to adoption with her notice of appeal, Mother did not attach the trial court's order terminating her parental rights. Finally, Mother's sole argument on appeal pertains to the relinquishment of her parental rights. Mother does not make any argument specific to her motion to withdraw her consent to adoption. Thus, we agree with the State that Mother has waived these issues for our review. Waiver notwithstanding, because of the significant interests at stake in a termination of parental rights, and because the crux of Mother's argument is the same with respect to both her consent to adoption and relinquishment of her parental rights, we exercise our discretion to address both issues on the merits.

[12]    Indiana Code Section 31-19-10-3 provides in relevant part as follows:

> (a) A consent to adoption may be withdrawn not later than thirty (30) days after consent to adoption is signed if:
>
>> (1) the court finds, after notice and opportunity to be heard afforded to the petitioner for adoption, that the person seeking the withdrawal is acting in the best interest of the person sought to be adopted; and
>>
>> (2) the court orders the withdrawal.
>
> (b) A consent to adoption may not be withdrawn after:

---

N.E.2d 886, 888 (Ind. Ct. App. 1983) (holding consent to adoption was not vitiated by the rescission of the termination of parental rights), *cert. denied*, 469 U.S. 892 (1984).

(1) thirty (30) days after the consent to adoption is signed;

(2) the person who signs the consent to adoption appears, in person or by telephonic communications or video conferencing, before a court in which the petition for adoption has been or will be filed and acknowledges that the person:

> (A) understood the consequences of the signing of the consent to adoption;

> (B) freely and voluntarily signed the consent to adoption; and

> (C) believes that adoption is in the best interests of the person to be adopted[.]

[13] For the execution of a parent's consent to be valid, the consent must be voluntary. *Bell v. A.R.H.*, 654 N.E.2d 29, 32 (Ind. Ct. App. 1995). A parent's consent to an adoption is voluntary if it is an act of the parent's own volition, free from duress, fraud, or any other consent-vitiating factor, and if it is made with knowledge of the essential facts. *Id.* The issue of an invalid consent may be raised by a petition to withdraw consent, and the burden of proof in such a matter falls on the petitioner. *Id.* Likewise, this court has held that "a parent who executes a voluntary relinquishment of parental rights is bound by the consequences of such action, unless the relinquishment was procured by fraud, undue influence, duress, or other consent-vitiating factors." *In the Matter of Snyder*, 418 N.E.2d 1171, 1180 (Ind. Ct. App. 1981).

Here, Mother's sole contention on appeal is that her consent to adoption and relinquishment of parental rights were not made voluntarily because she was under duress at the time she executed those documents. Specifically, Mother maintains that "her duress arose from the consistent and constant threat of never regaining custody" of R.H. to the extent that Mother was "traumatized" and "lost all hope." Appellant's Br. at 13. Mother asserts that "[t]he repeated change in providers, case managers, and services created a moving target for the necessary steps for reunification to the point that a reasonable person would have found the task to be impossible." *Id.*

In *Youngblood v. Jefferson County Division of Family and Children*, 838 N.E.2d 1164, 1170-71 (Ind. Ct. App. 2005), *trans. denied*, this court held as follows:

> "[I]n order to avoid a contract on the basis of duress, there must be an actual or threatened violence of restraint of a man's person contrary to law, to compel him to enter into a contract or discharge one." *Carrasco v. Grubb*, 824 N.E.2d 705, 711 (Ind. Ct. App. 2005) (quotations and citation omitted), *trans. denied.* In deciding whether a person signed a document under duress, "the ultimate fact to be determined is whether or not the purported victim was deprived of the free exercise of his own will." *Raymundo v. Hammond Clinic Ass'n*, 449 N.E.2d 276, 283 (Ind. 1983).

Here, there is no evidence of any threatened violence or physical restraint to Mother. Mother alleges only that the pressure to comply with the court-ordered services was overwhelming to the extent that she lost hope of ever regaining custody of R.H. But this court has held that "emotion, tensions, and pressure

are . . . insufficient to void a consent unless they rise to the level of overcoming one's volition." *In re Adoption of Hewitt*, 396 N.E.2d 938, 942 (Ind. Ct. App. 1979). Mother was represented by counsel at all stages of the proceeding, and Mother has acknowledged that her attorney made clear to her that she did not have to give up her rights to R.H. or consent to adoption. Mother acknowledged, in open court, that she had voluntarily executed both the consent to adoption and relinquishment of parental rights. Finally, Mother conceded at the hearing on her motion to withdraw her consent to adoption that she "chose" to give up her parental rights to R.H. Tr. at 73.

[17] Mother's contentions on appeal amount to a request that we reweigh the evidence, which we will not do. Mother has not demonstrated that her free will was overcome when she signed the consent and relinquishment of parental rights. Accordingly, Mother has not shown that either document was obtained by duress, and the trial court did not err when it terminated her parental rights to R.H. *See, e.g.*, *Youngblood*, 838 N.E.2d at 1170-71.

[18] Affirmed.


Kirsch, J., and Barnes, J., concur.