# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEY FOR APPELLANT

Danielle L. Gregory
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Marjorie Newell
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the parent-Child Relationship of:

J.W. and D.C. (Minor Children),

And

J.W. (Father),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

January 24, 2017

Court of Appeals Case No. 49A05-1607-JT-1663

Appeal from the Marion Superior Court

The Honorable Marilyn Moores, Judge

The Honorable Larry Bradley, Magistrate

Trial Court Cause No. 49D09-1603-JT-233 & 49D09-1603-JT-234

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Respondent, J.W. (Father), appeals the trial court's termination of his parental rights to his minor children, J.W. II and D.C. (the Children).

We affirm.

## ISSUE

Father raises one issue on appeal, which we restate as follows: Whether the trial court erred by involuntarily terminating Father's parental rights to the Children in light of his indication that he wished to consent to the Children's adoption.

## FACTS AND PROCEDURAL HISTORY

Father and S.C. (Mother)[1] are the biological parents of J.W. II, born on February 10, 2011; and D.C., born on October 8, 2013. On September 24, 2012, the Marion County office of Department of Child Services (DCS) received a report alleging the medical neglect of J.W. II. In particular, the report indicated that J.W. II was being treated for seizures at the emergency room at Riley Hospital for Children in Indianapolis, Marion County, Indiana. J.W. II was diagnosed with seizures when he was three weeks old, and since

---

[1] Mother's parental rights to the Children were previously terminated, but she is not a party to this appeal. Facts pertaining to Mother are included where appropriate.

that time, there had been serious concerns about the fact that Mother repeatedly failed to follow through with medical appointments to ensure that J.W. II received his necessary medication. The report to DCS indicated that J.W. II's physician was worried that Mother would fail to properly care for his medical needs upon discharge. That day, DCS spoke with Mother, who admitted that J.W. II had not taken his seizure medication since February of 2012 because "their Medicaid was 'called off.'" (DCS Exh. 1). Mother claimed to be unaware of the fact that she missed multiple neurology appointments for J.W. II. Father was also present at the Riley Hospital emergency room and, even though Father was living in the same house as Mother and J.W. II, he informed DCS that he had no knowledge that J.W. II had ever been diagnosed with seizures, that he was not receiving his medication, or that he had missed any appointments because Mother "takes care of that." (DCS Exh. 1). Father explained that he is not home during the week because of his employment and is therefore unable to help Mother with caring for J.W. II. Upon further investigation, DCS also discovered that there was a cockroach infestation in the family's home and that the rent was past due. Mother admitted to consuming Hydrocodone without a prescription, and both Father and Mother tested positive for marijuana.

[5] On September 26, 2012, DCS filed a petition alleging that J.W. II was a child in need of services (CHINS) because Father and Mother "have failed to provide the child with a safe and appropriate living environment with necessary medical care/treatment and free from substance abuse." (DCS Exh. 1). DCS

elaborated that Mother had failed to address J.W. II's medical issues, tested positive for marijuana, and lacked stable housing. As to Father, DCS contended that he had failed to demonstrate an "ability and willingness to appropriately care for [J.W. II]" and that he "is unable to ensure [J.W. II's] safety and well being while in the care and custody of [Mother]." (DCS Exh. 1). The same day, the trial court held an initial hearing. Because Father and Mother both requested attorneys, the trial court entered a denial to the allegations contained in the CHINS petition on the parents' behalf. The trial court ordered that J.W. II would remain in his parents' care "contingent upon [Father and Mother] participating in Homebuilders, substance abuse assessment and following any recommendations and random drug screens." (DCS Exh. 2).

[6] On October 3, 2012, the trial court held another hearing, during which Mother admitted to the amended allegations of the CHINS petition, and Father waived a fact-finding hearing. Accordingly, the trial court adjudicated J.W. II as a CHINS. On October 31, 2012, the trial court conducted a dispositional hearing and subsequently issued a dispositional order. The trial court ordered J.W. II to remain placed in Mother's custody and further ordered both Father and Mother to participate in services pursuant to the Parental Participation Order. In relevant part, the Parental Participation Order directed the parents to enroll and participate in any programs recommended by DCS; ensure that J.W. II is properly clothed, fed, and supervised; establish Father's paternity to J.W. II;

engage in home-based counseling; and submit to random drug and alcohol screens.

[7] At some point, Father and Mother ceased living together, and both struggled to comply with their case plans. Specifically, Father regularly failed to appear for drug screens, and on other occasions, he tested positive for THC (marijuana), Oxycodone,[2] and opiates. On May 23, 2013, J.W. II was removed from Mother's custody due to her lack of suitable housing. Despite Father's general non-compliance with his DCS services, J.W. II was placed in his care. However, on July 18, 2013, J.W. II was removed from Father's custody based on Father's failure to appear at multiple drug screens, as well as a positive drug screen. On July 24, 2013, Father offered employment-related justifications for his missed drug screens, and the trial court ordered the return of J.W. II to his care.

[8] On October 11, 2013, DCS filed a petition alleging that three-day-old D.C. was a CHINS. In particular, DCS alleged that Mother had "failed to provide [D.C.] with a safe and appropriate living environment free from substance abuse." (DCS Exh. 10). In addition to Mother's non-compliance with her case plan in J.W. II's case, DCS cited Father's marijuana-positive drug screens and lack of consistency in submitting to drug screens, as well as his failure "to demonstrate the ability and willingness to appropriately parent [D.C.]." (DCS Exh. 10). On

---

[2] There is some indication that Father, for at least some period of time, had a prescription for Oxycodone.

December 11, 2013, the trial court adjudicated D.C. as a CHINS based on Mother's admission to the allegations in the CHINS petition. Because Father was not present during the initial hearing, the matter was continued as to him.

[9] On December 18, 2013, D.C. was removed from Mother's care due to the poor condition of Mother's home, and he was placed in foster care. The next day, J.W. II was removed from Father's care because Father refused to participate in services, tested positive for methamphetamine, and threatened J.W. II's babysitter with a knife. J.W. II was placed in the care of relatives. In October of 2014, D.C. was transferred to the same home as J.W. II.

[10] In April of 2014, Father's paternity to D.C. was established. On April 23, 2014, Father waived his right to a fact-finding hearing, and the trial court maintained D.C.'s adjudication as a CHINS. Following a dispositional hearing on the same day, Father was ordered to engage in home-based counseling; complete a substance abuse assessment and successfully complete all treatment recommendations; submit to random drug screens; and participate in home-based case management services. Father did not comply. As of July of 2014, Father had been discharged from his home-based services twice due to his non-compliance. At the time, Father was continuing to test positive for illegal drugs, including opiates, Hydrocodone, Amphetamine, and Methamphetamine, and he never completed drug education or treatment.
Father also lacked stable housing. In fact, DCS was unaware of Father's whereabouts and was concerned that he might be homeless. In addition, Father had not made himself available for visits with the Children for several months.

[11]   On October 29, 2014, the trial court changed the Children's permanency plan from reunification with the parents to adoption, and on March 22, 2016, DCS filed a verified petition for the involuntary termination of Father's parental rights to the Children. On April 1, 2016, the trial court held an initial hearing on DCS' termination petition. Father advised the court that he wished to sign consents for the Children to be adopted; however, DCS indicated that it could not accept such consents because Father was not represented by counsel. Accordingly, the trial court appointed a public defender "to represent Father to help facilitate consents." (Appellant's App. Vol. II, p. 39). The trial court also appointed a guardian ad litem (GAL) to represent the interests of the Children.

[12]   On April 15, 2016, the trial court held a pre-trial hearing. Although Father's appointed counsel was present, Father "fail[ed] to appear after having said he wanted to sign adoption consents at the last hearing. [Father's counsel] request[ed] another pre-trial hearing and indicate[d] he [would] try to get Father in to his office for effectuating rights." (Appellant's App. Vol. II, p. 49). Accordingly, the trial court scheduled another pre-trial hearing for April 29, 2016, at which Father, again, failed to appear. As such, Father's counsel requested a third pre-trial hearing in order for Father to appear in court and sign adoption consents. Instead, on June 29, 2016, the trial court conducted an evidentiary hearing on DCS' termination petition. Once again, Father did not attend, and by that point, he had not seen the Children in more than a year. During the hearing, the DCS case worker testified that it would be in the best interests of the Children for Father's rights to be terminated. The GAL

submitted an affidavit to the court echoing DCS' opinion.  On June 30, 2016, the trial court issued its Order, terminating Father's parental rights to the Children.

Father now appeals.  Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

Father challenges the involuntary termination of his parental rights.  "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'"  *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009) (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)).  Accordingly, the Fourteenth Amendment to the United States Constitution safeguards "the traditional right of parents to establish a home and raise their children."  *Id.*  Nevertheless, "parental rights are not absolute and must be subordinated to the child's interests."  *S.L. v. Ind. Dep't of Child Servs.*, 997 N.E.2d 1114, 1122 (Ind. Ct. App. 2013) (internal quotation marks omitted) (quoting *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010)).  Thus, parental rights may be terminated if the "parents are unable or unwilling to meet their parental responsibilities."  *In re G.Y.*, 904 N.E.2d at 1259-60.  It is important to acknowledge that the termination of a parent's rights is "an extreme measure and should only be utilized as a last resort when all other reasonable efforts to protect the integrity of the natural relationship between parent and child have

failed." *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 646 (Ind. 2015) (internal quotation marks omitted).

[15] When reviewing the termination of a parent's rights on appeal, our court neither reweighs evidence nor assesses the credibility of witnesses. *In re G.Y.*, 904 N.E.2d at 1260. Instead, we will "consider only the evidence and reasonable inferences that are most favorable to the judgment." *Id.* Furthermore, because the trial court issued specific findings of fact and conclusions thereon in granting DCS' petition to terminate Father's rights, we must engage in the two-fold standard of review set forth in Indiana Trial Rule 52(A): "[f]irst, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment." *Id.* We "shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52(A). We will find clear error only "if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *In re G.Y.*, 904 N.E.2d at 1260 (quoting *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005)).

## II. *Voluntary Termination of Parental Rights*

[16] In general, in order to terminate a parent's rights, DCS must prove, in relevant part, that the child has been removed from the home for a specific period of time, and

> (B) that one (1) of the following is true:
> (i) There is a reasonable probability that the conditions that

resulted in the child's removal or the reasons for placement
outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of
the parent-child relationship poses a threat to the well-being of
the child.

(iii) The child has, on two (2) separate occasions, been
adjudicated a [CHINS].

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of
the child.

Ind. Code § 31-35-2-4(b)(2). DCS is required to prove each of these elements by clear and convincing evidence. *In re G.Y.*, 904 N.E.2d at 1260. However, in addition to the court's authority to sever a parent's rights to his children, Indiana statutes also provide that a parent may voluntarily consent to the termination of the parent-child relationship. *See* I.C. ch. 31-35-1. In such a case, DCS is relieved of its burden to prove by clear and convincing evidence" the elements set forth in Indiana Code 31-35-2-4(b)(2). *In re M.R.*, 728 N.E.2d 204, 209 (Ind. Ct. App. 2000), *trans. denied*.

[17] In this case, Father raises no challenge to the sufficiency of DCS' evidence regarding any of the factors set forth in Indiana Code section 31-35-2-4(b)(2), nor does Father challenge any of the trial court's factual findings or legal conclusions. Rather, Father's sole claim on appeal is that the trial court erroneously entered an involuntary termination order based on the fact that Father was willing to consent to the termination. According to Father, "an involuntary termination has the impact of reducing Father's chances of receiving reasonable effort[s] to reunify or preserve his family if he ever finds

himself in the position of having children who are adjudicated CHINS in the future." (Appellant's Br. p. 15). *See* I.C. § 31-34-21-5.6(b)(4) (providing that DCS is not required to undertake reasonable efforts to reunify a family if "[t]he parental rights of a parent with respect to a biological or adoptive sibling of a [CHINS] have been involuntarily terminated by a court"). Based on this "potential to affect Father and his future children[,]" Father requests that we vacate the involuntary termination order in lieu of a voluntary termination. (Appellant's Br. p. 16). We, however, find that Father missed his opportunity to consent to a voluntary termination, and the trial court committed no error by entering an involuntary termination order.

[18] Indiana Code section 31-35-1-4(a) provides that, "[i]f requested by the parents[,]" DCS may file a verified petition "for the voluntary termination of the parent-child relationship." This petition must allege, in part, that the parents "knowingly and voluntarily consent to the termination of the parent-child relationship"; that termination is in the child's best interest; and that there is a satisfactory plan for the child's care and treatment. I.C. § 31-35-1-4(b)(2). Here, notwithstanding that Father and DCS, at some point, had discussed Father's desire to sign consents for the Children's adoption, DCS filed a petition for the *involuntary* termination of Father's rights.[3] Nevertheless, we look to Indiana Code section 31-35-1-6(a)-(b), which states:

_____

[3] At some point, Father had signed consents for the Children's adoption, but that specific placement fell through. Thereafter, Father informed DCS that he would be willing to re-sign consents based on the fact that

> Except as [otherwise] provided . . . , the parents must give their
> consent in open court unless the court makes findings of fact
> upon the record that:
> (1) the parents gave their consent in writing before a person
> authorized by law to take acknowledgments; and
> (2) the parents were:
>    (A) advised in accordance with section 12 of this chapter; and
>    (B) advised that if they choose to appear in open court, the
> only issue before the court is whether their consent was
> voluntary.

I.C. § 31-35-1-6(a). According to Father, the fact that he expressed his desire to sign adoption consents during the initial hearing should have been sufficient for the trial court to enter a voluntary termination order. We disagree.

[19] "[T]ermination proceedings pursuant to a parent's consent remain subject to the safeguards outlined in the statutes governing voluntary termination of parental rights." *In re M.R.*, 728 N.E.2d at 208. Thus, not only must the parent give consent in open court, but the trial court must "further assure the voluntariness of the consent." *Id.* Specifically, "[b]efore consent may be given in court, the court must advise the parents of: (1) their constitutional and other legal rights; and (2) the consequences of their actions under section 12 of this chapter." I.C. § 31-35-1-8. Section 12 of the voluntary termination chapter stipulates that

> . . . the parents must be advised that:
> (1) their consent is permanent and cannot be revoked or set aside
> unless it was obtained by fraud or duress or unless the parent is

---

he was unable to care for the Children and was still abusing drugs. It is unclear whether these discussions concerning Father's consent occurred before or after DCS filed the involuntary termination petition.

incompetent;

(2) when the court terminates the parent-child relationship:

    (A) all rights, powers, privileges, immunities, duties, and obligations, including any rights to custody, control, parenting time, or support pertaining to the relationship, are permanently terminated; and

    (B) their consent to the child's adoption is not required;

(3) the parents have a right to the:

    (A) care;

    (B) custody; and

    (C) control;

of their child as long as the parents fulfill their parental obligations;

(4) the parents have a right to a judicial determination of any alleged failure to fulfill their parental obligations in a proceeding to adjudicate their child a delinquent child or a [CHINS];

(5) the parents have a right to assistance in fulfilling their parental obligations after a court has determined that the parents are not doing so;

(6) proceedings to terminate the parent-child relationship against the will of the parents can be initiated only after:

    (A) the child has been adjudicated a delinquent child or a [CHINS] and removed from their custody following the adjudication; or

    (B) a parent has been convicted and imprisoned for an offense listed in [Indiana Code section] 31-35-3-4 (or has been convicted and imprisoned for an offense listed in [Indiana Code section] 31-6-5-4.2(a) before its repeal), the child has been removed from the custody of the parents under a dispositional decree, and the child has been removed from the custody of the parents for six (6) months under a court order;

(7) the parents are entitled to representation by counsel, provided by the state if necessary, throughout any proceedings to terminate the parent-child relationship against the will of the parents;

(8) the parents will receive notice of the hearing, unless notice is waived under section 5(b) of this chapter, at which the court will decide if their consent was voluntary, and the parents may

appear at the hearing and allege that the consent was not voluntary; and

(9) the parents' consent cannot be based upon a promise regarding the child's adoption or contact of any type with the child after the parents voluntarily relinquish their parental rights of the child after entry of an order under this chapter terminating the parent-child relationship.

I.C. § 31-35-1-12.

[20] There is no dispute that the trial court did not administer these warnings to Father at the time Father first declared his desire to consent in open court, and Father never offered any indication that his "consent was given with full knowledge of [his] constitutional and other legal rights." *In re M.R.*, 728 N.E.2d at 209. Rather, at the initial hearing, the trial court appropriately appointed counsel to represent Father in order to ensure that Father fully understood the gravity of his rights prior to consenting to the termination. *See, e.g.*, I.C. § 31-32-4-3(a) (requiring the trial court to appoint counsel for an unrepresented parent in a termination proceeding "at the initial hearing or at any earlier time" unless the parent waives his right to counsel). Thereafter, despite multiple opportunities to appear in court and affirm that he was willfully consenting to the termination with full knowledge of his rights, Father failed to appear. As such, we find that he waived his opportunity to voluntarily consent, and the trial court appropriately proceeded with the involuntary termination.

# CONCLUSION

Based on the foregoing, we conclude that the trial court did not err in terminating Father's parental rights to the Children.

Affirmed.

Crone, J. and Altice, J. concur