

FILED
Jun 10 2020, 9:00 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT T.J.

Cara Schaefer Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEY FOR APPELLANT D.C.

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary
Termination of the Parent-Child
Relationship of D.C., Jr. (Minor
Child)

    and

T.J. (Mother) and D.C. (Father),

*Appellants-Respondents,*

v.

The Indiana Department of
Child Services,

*Appellee-Petitioner.*

June 10, 2020

Court of Appeals Case No.
19A-JT-2832

Appeal from the Putnam Circuit
Court

The Honorable Matthew L. Headley,
Judge

Trial Court Cause No.
67C01-1903-JT-6

**Bailey, Judge.**

# Case Summary

[1] D.C. ("Father") and T.J. ("Mother") appeal the order terminating their parental rights to D.C., Jr. ("Child"). Father alleges that the Putnam County Department of Child Services ("DCS") failed to present sufficient evidence to support the termination of his parental rights. Having identified sufficient evidence as to Father, we affirm the termination of his parental rights. With respect to Mother, the termination of her parental rights was predicated on Mother's written consent. As to her consent, there is no dispute that Mother received eight out of nine statutory advisements before she signed a consent form. However, there is equivocal evidence about whether Mother received the ninth advisement, which specifies that consent cannot be based upon promises regarding adoption or post-termination contact. Mother argues that she is entitled to reversal because there is inadequate evidence of consent. We agree that reversal is appropriate, and we remand with instructions for further fact-finding regarding whether Mother received the ninth statutory advisement.

# Facts and Procedural History

[2] Child was born to Mother and Father on December 22, 2013. In December 2017, DCS filed a petition alleging that Child was a Child in Need of Services ("CHINS") due to neglect. Specifically, DCS alleged that it received a report that Mother was using methamphetamine in the home. DCS alleged that it contacted Mother, who submitted to a drug screen, and that Mother tested positive for methamphetamine. DCS alleged that Mother was on probation for

a methamphetamine-related offense. DCS further alleged that Father was incarcerated and that it was unable to locate a suitable kinship placement. DCS ultimately removed Child from Mother's care and placed Child in foster care.

[3] An initial hearing was held on December 21, 2017, at which Mother and Father admitted to the CHINS allegations. The court adjudicated Child a CHINS, ordered that Child remain in foster care, and scheduled separate dispositional hearings for Mother and Father. DCS filed a Pre-Dispositional Report in which it recommended that the permanency plan for Child be reunification with services for Mother and Father. Following a dispositional hearing as to Father, the trial court entered a dispositional order on May 23, 2018. Therein, the trial court ordered Father to contact the Family Case Manager ("FCM") weekly. The court further ordered that "[i]f a program or programs is/are recommended by the [FCM] or other service provider," Father must "enroll in that program [in] a reasonable time, not to exceed thirty (30) days and participate in the program as scheduled by that program without delay or missed appointments. If required to obtain an assessment, [Father must] arrange to complete that assessment within thirty (30) days." Ex. Vol. 3 at 57. The court also ordered Father to—among other things—(1) keep all appointments with service providers; (2) refrain from using illegal substances; (3) submit to random drug screens; (4) complete a substance-abuse assessment and successfully complete all treatment recommendations; (5) attend all scheduled visitations with Child and comply with all visitation rules and procedures; (6) secure and maintain a stable source of income; and (7) maintain safe and stable housing.

[4] In the ensuing months, Child remained in foster care with supervised visits. On February 18, 2019, the trial court found that Mother and Father had not been fully compliant with the case plan. The trial court entered an order changing the permanency plan to reunification with a concurrent plan of adoption.

[5] On March 14, 2019, DCS filed a petition to terminate Mother's and Father's parental rights. A fact-finding hearing commenced on May 23, 2019, and concluded on August 27, 2019. Mother was not present at the August 2019 hearing, at which the court received a signed form titled "Voluntary Relinquishment of Parental Rights." App. Vol. 2 at 84. Mother's counsel said that he met with Mother and "went over the rights and obligations and what she – the results of voluntary termination with her prior to signing it. And she did sign the voluntary termination in front of me and acknowledged her signature in front of the court reporter . . . ." Tr. Vol. 2 at 29. The court then inquired about Mother's absence. Mother's counsel said that Mother was not present because she "became physically ill after she signed it." *Id.* The court then orally granted DCS's request to terminate Mother's parental rights, noting that it would "show . . . that she signed the voluntary relinquishment of her rights with her attorney, and her attorney is present here today and had an opportunity to speak with her." *Id.* at 32. Fact-finding resumed as to Father.

[6] At the fact-finding hearing, there was evidence that Father pleaded guilty to committing Level 6 felony Auto Theft in 2016 and received a 545-day sentence that was fully suspended to probation. On December 13, 2017—around the time Child was removed from Mother's care—Father admitted to violating the

conditions of his probation. Specifically, Father admitted that he (1) committed Class A misdemeanor Driving While Suspended; (2) failed to timely contact his probation officer when he was charged with that offense; (3) failed to report to five scheduled probation appointments; (4) was dishonest with his probation officer about using illegal drugs; and (5) submitted urine screens that tested positive for illegal drugs in February, March, and April of 2017. As to the drug screens, two of the screens tested positive for amphetamine, methamphetamine, and marijuana—the third drug screen tested positive for marijuana. Father's probation was revoked and he was ordered to serve 180 days in jail.

[7] Father was released from jail in early 2018. FCM David Fissell ("FCM Fissell") testified that Father participated in a substance-abuse assessment at Cummins on March 6, 2018. That assessment did not result in treatment recommendations for Father. There was evidence that Father subsequently tested positive for methamphetamine in May 2018, "so the case manager at the time pursued services with Cummins." Tr. Vol. 2 at 67. FCM Fissell testified that Father "became non-compliant with services and was discharged" from Cummins. *Id.* At some point before October 2018, the FCM at the time referred Father for an intake with a different service provider, Hamilton Center, "to see if there were barriers regarding not only the substance uses but also . . . stability, home stability, coping skills, if he has had past trauma." *Id.*

[8] In the fall of 2018, Father was charged with Class A misdemeanor Theft, reportedly committed on October 12, 2018. Father was incarcerated from November 15, 2018, until January 7, 2019. He later pleaded guilty to the

October 2018 Theft and to a count of Class B misdemeanor Possession of Marijuana concerning conduct in August 2017. For the Theft, Father was sentenced to one year in jail, with the sentence fully suspended to probation.

[9] When Father was released in January 2019, he contacted the FCM assigned at the time and "said he wanted to get started back up in the services." *Id.* at 57. The FCM explained that Father needed to go to Hamilton Center to complete the intake. Father went to Hamilton Center around January 17, 2019, and was told that the referral had expired. The FCM then put in a new referral.

[10] Father had positive drug screens throughout the proceedings. On May 1, 2018, Father tested positive for amphetamine and methamphetamine. On July 16, 2018, Father tested positive for THC. On July 30, 2018, and again on August 2, 2018, Father tested positive for amphetamine, methamphetamine, and THC. On October 15, 2018, Father testified positive for buprenorphine. On May 23, 2019, Father "tested positive for marijuana." Tr. Vol. 2 at 75. On July 14, 2019, Father declined to submit to a drug screen. At the time, he did not explain why, he "just shook his head that he wouldn't screen . . . ." *Id.* at 72.

[11] There was evidence that Father was inconsistent in attending supervised visits. After cancellations and no-shows from Father and Mother, in February 2019 the service provider began requiring the parents to confirm visits in advance. For the next two months, Father failed to contact the service provider to set up a visit. Father also missed a visit in the week prior to the August 2019 fact-finding hearing. At no point did Father progress to unsupervised visits.

[12]     FCM Fissell agreed that it was a "common theme" that Father would express interest in participating in services but would ultimately not follow through. *Id.* at 71. When asked about services, Father said that he participated in the Cummins intake and "was ordered to take another one for whatever reason, which [he] had not got[ten] around to doing." *Id.* at 36. Father said, "I just haven't got[ten] to it." *Id.* at 104. He testified as follows: "I don't see the need to do[] something two and three and four times. Nothing really has changed that much that would significantly change what I need in my life." *Id.* at 105.

[13]     On September 25, 2019, the court entered a written order terminating Mother's and Father's parental rights. The court entered certain findings as to Mother:

> Upon the presentation and admission into evidence of a validly-executed Voluntary Relinquishment of Parental Rights notarized by the court clerk and reviewed with Mother by her attorney, the Court granted a voluntary termination as to Mother. Mother declined to testify; her attorney stated he had reviewed her rights with her and the court clerk verified Mother's signature.

App. Vol. 2 at 59. As to Father, the court found that there were dispositional requirements imposed on Father, including "[e]nroll[ing] in recommended programs within a reasonable time" and "[s]ubmit[ting] to random drug screens." *Id.* at 61. The court found that Father "failed to comply with the services offered in the dispositional order." *Id.* at 63. The court observed that "Father admitted that[,] in an entire year, he did not get to . . . Hamilton Center to complete his intake assessment." *Id.* It also found that "[i]f Child is returned to Father, he would be under the same threats he was previously." *Id.*

The court further found that Child had been removed for at least six months under a dispositional order as of the time the petition was filed. It also found a reasonable probability that Father would not remedy the conditions that resulted in Child's removal and placement outside the home, identifying "a substantial probability of future neglect by Father." *Id.* at 68. The court found that "Father's lack of commitment to the CHINS process demonstrates his lack of commitment to his child and shows a reasonable probability that he will continue to fail the Child." *Id.* It also found that terminating Father's parental rights was in Child's best interests and that adoption was a satisfactory plan.

After Mother's parental rights were terminated, she wrote to the court several times, requesting "another chance" and the opportunity to visit Child. App. Vol. 2 at 90. Mother and Father now bring this consolidated appeal.

# Discussion and Decision

## Standard of Review

"A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005) (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). "Indiana law has accordingly established a 'high bar' for the termination of parental rights." *In re Bi.B.*, 69 N.E.3d 464, 467 (Ind. 2017). A petition to terminate those rights must allege, in pertinent part:

> (A) that one (1) of the following is true:

> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree. . . .
>
> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied. . . .
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). To grant a petition, the court must enter findings of fact to support termination. *See* I.C. § 31-35-2-8(c); Ind. Trial Rule 52(A).

[17] When a court enters findings and conclusions, we ordinarily look to whether the evidence supports the findings and the findings support the judgment—reversing upon clear error. T.R. 52(A); *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016). However, our legislature has directed that "[a] finding in a proceeding to terminate parental rights must be based upon clear and convincing evidence." I.C. § 31-37-14-2. This is a "'heightened burden of proof' reflecting termination's 'serious social consequences.'" *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014) (quoting *In re G.Y.*, 904 N.E.2d 1257, 1260-61 & n.1 (Ind. 2009)). In light of this heightened burden of proof, we review "whether the evidence clearly and convincingly supports the findings and the findings clearly and

convincingly support the judgment." *In re R.S.*, 56 N.E.3d at 628 (quoting *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010)). We will not set aside the findings or judgment unless clearly erroneous. T.R. 52(A); *In re E.M.*, 4 N.E.3d at 642. In conducting our review, we "consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence." *In re E.M.*, 4 N.E.3d at 642 (quoting *Egly v. Blackford Cty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992)). Indeed, we do not reweigh the evidence, *id.*, and must give "due regard . . . to the opportunity of the trial court to judge the credibility of the witnesses." T.R. 52(A). Moreover, to the extent the appeal involves a question of law—such as the interpretation of a statute—we will review the question of law *de novo*. *In re Bi.B.*, 69 N.E.3d at 466.

# Father

[18] Father does not dispute that Child had been removed for the statutory period or that adoption is a satisfactory plan. *See* I.C. § 31-35-2-4(b)(2)(A), (b)(2)(D). Rather, he challenges the sufficiency of the evidence supporting the following findings: (1) there is a reasonable probability that the conditions resulting in Child's removal or placement outside the home will not be remedied and (2) termination is in Child's best interests. *See* I.C. § 31-35-2-4(b)(2)(B), (b)(2)(C).[1]

---

[1] Father argues that it is unclear whether the court found an alternative basis for termination under subsection (b)(2)(B). Because that portion of the statute is written in the disjunctive, we need not resolve that issue and will focus only on the clearly entered finding under that subsection. *See* I.C. § 31-35-2-4(b)(2)(B).

# Remedied Conditions

In evaluating the likelihood of remedied conditions, the trial court is obligated to consider the parent's fitness at the time of the termination hearing, taking into account evidence of changed conditions. *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 647 (Ind. 2015). "Changed conditions are balanced against habitual patterns of conduct to determine whether there is a substantial probability of future neglect." *Id.* In evaluating a parent's habitual patterns of conduct, the court may consider the parent's "criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment"—among other things. *Id.* (quoting *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*). Moreover, the court may consider "the services offered to the parent and the parent's response to those services" when evaluating whether there is a reasonable probability that the pertinent conditions will be remedied. *Id.* Notably, before a court may rely on non-compliance with services, there must be "some proof of the underlying problematic conditions for which services were required to begin with." *In re K.T.*, 137 N.E.3d 317, 328 (Ind. Ct. App. 2019). In other words, there must be some evidence of a parent's unfitness. *Id.*

Here, DCS presented evidence that Child was removed in December 2017 because Mother had used methamphetamine in the home. Father was incarcerated. When Father was released in early 2018, he participated in a substance-abuse assessment through Cummins, which did not result in treatment recommendations. Shortly thereafter—in May 2018—Father tested

positive for methamphetamine and amphetamine. Father then received some level of services from Cummins and was later unsuccessfully discharged. At some point before October 2018, DCS referred Father to Hamilton Center for an intake. For approximately one year thereafter, Father failed to complete the intake. Meanwhile, Father periodically tested positive for illegal drugs. When asked about services in the case, Father testified that he "was ordered to take another [intake] for whatever reason, which [he] had not got[ten] around to doing." *Id.* at 36. Father's testimony indicates a failure to appreciate that Child had been placed in foster care due to Mother's drug abuse. Father wished to rely on the Cummins intake—which he claims placed him as "a zero on a scale of needing services," *id.*—despite having tested positive for drugs after the intake and having been unsuccessfully discharged from services at Cummins.

[21] In challenging the sufficiency of the evidence, Father suggests that FCM Fissell was "likely confused" when he testified that Father submitted a positive drug screen in May 2019. Br. of Father at 19. However, FCM Fissell answered affirmatively when asked whether Father submitted a positive drug screen on "5/23," responding: "I believe that is the correct date. I know it was in May." Tr. Vol. 2 at 76-77. When prompted to clarify which year, FCM Fissell replied: "2019." *Id.* Father asserts that there is no corroborating exhibit showing a positive drug screen in May 2019. Father also speculates that supervised visits "almost certainly would have been halted until [Father] presented a drug-free screen." Br. of Father at 19. However, FCM Fissell's testimony provides

sufficient evidence that Father tested positive in May 2019. We must reject Father's requests to reweigh evidence regarding ongoing substance use.

[22] Father also notes that it was Mother—not Father—who abused substances when the CHINS case commenced. That is true. However, the evidence amply supports findings that "there is a substantial probability of future neglect by Father," App. Vol. 2 at 68, and "[i]f Child is returned to Father, he would be under the same threats he was previously," *id.* at 63. Indeed, it is reasonable to infer from the evidence that Father would not address his own issues with illegal substances, subjecting Child to the same type of neglect that Mother did.

[23] Father challenges other findings.[2] However, the record contains evidence of unaddressed issues with substance abuse. That evidence and findings related thereto support the ultimate finding regarding unremedied conditions. Thus, we need not address Father's challenges to other findings in the context of unremedied conditions. *See In re G.M.*, 71 N.E.3d 898, 907-08 (Ind. Ct. App. 2017) (regarding a challenged finding as surplusage—at most harmless error—

---

[2] In his Reply, Father asserts that DCS failed to adequately cite to the record and refute challenges to certain findings. According to Father, "[b]y failing to do so, DCS essentially has waived any claim that [those] findings are supported by the evidence." Father's Reply at 6. However, the Appellant bears the burden of demonstrating reversible error. *E.g.*, *Witherspoon v. Salm*, 202 N.E.2d 892, 893 (Ind. Ct. App. 1964), *trans. denied*. When the Appellee ignores issues, we may reverse upon a showing of *prima facie* error. *E.g.*, *In re Parrish's Estate*, 293 N.E.2d 62, 65 (Ind. Ct. App. 1973). Even assuming without deciding that this lesser burden applies in this case, Father is not relieved from his burden of showing that the evidence does not support the findings and the findings do not support the judgment. *See generally In re E.M.*, 4 N.E.3d at 642.

where there were otherwise adequate findings to support the decision). We will address his contentions as necessary when considering Child's best interests.

## Best Interests

"When determining what is in children's best interests, trial courts may consider a variety of factors." *In re M.I.*, 127 N.E.3d 1168, 1171 (Ind. 2019) (emphasis removed). A child's need for permanency is among the factors a court may consider, but it "is not reason enough to terminate parental rights where the parent has an established relationship with his/her child" and has "taken positive steps" in accordance with the plan for reunification. *In re V.A.*, 51 N.E.3d 1140, 1152 (Ind. 2016). Ultimately, terminating parental rights is a "last resort" that is available "only when all other reasonable efforts have failed." *In re R.S.*, 56 N.E.3d at 631 (quoting *In re V.A.*, 51 N.E.3d at 1151-52).

[24] When Child was removed from Mother's care, Father was unable to care for Child because Father was incarcerated. Father committed another criminal offense during the pendency of the CHINS matter and was incarcerated for more than a month. Father continued to use illegal substances during the pendency of the case. Despite being repeatedly informed that an uncompleted intake was a barrier to reunification, Father declined to complete the intake.

[25] In July 2019, Father declined a drug screen. Father claims he was justified in doing so because the screen interfered with visitation. However, regardless of Father's subjective beliefs, the refusal was part of a larger pattern of conduct showing a failure to follow through with important steps toward reunification.

Notably, Child's court-appointed special advocate (the "CASA") testified that she met with Father about ten days before the fact-finding concluded, at which point Father expressed an interest in "complet[ing] services so that he could reunify with his son." Tr. Vol. 2 at 97. The CASA explained that "if that was truly his intention, there were a few things that he was going to need to do in the next ten days"—and they "went over those at length." *Id.* One step was to "immediately get in touch with [FCM Fissell]." *Id.* Another step was to allow the CASA to attend a supervised visit scheduled for August 25, two days before the fact-finding hearing. The third step was to explore "possible options for living," *id.*, as Father had been homeless at times during the proceedings.

[26] In the ten days before the fact-finding hearing, Father did not contact FCM Fissell and he did not attend the scheduled supervised visit. Father made some progress by arranging to live with a family member. Moreover—as Father points out—over the course of the proceedings Father made progress toward obtaining stable employment. However, he failed to make sustained progress toward reunification by failing to fully comply with the dispositional order.

[27] As to non-compliance, Father challenges the finding that he "failed to comply with the services offered in the dispositional order," App. Vol. 2 at 76, contending that he "largely complied," Br. of Father at 17. Father asserts that the court did not directly order a second assessment and "DCS's request for a second assessment . . . without any further court order was unreasonable." *Id.* However, whether or not the court directly ordered a second assessment, the dispositional order provided that "[i]f a program or programs is/are

recommended by the [FCM] or other service provider," Father must "enroll in that program [in] a reasonable time, not to exceed thirty (30) days and participate in the program as scheduled by that program without delay or missed appointments. If required to obtain an assessment, [Father must] arrange to complete that assessment within thirty (30) days." Ex. Vol. 3 at 57. Father failed to comply with the foregoing portion of the order. Moreover, we disagree that it was unreasonable to recommend a second assessment after Father tested positive for an illegal substance and was unsuccessfully discharged from services at Cummins. The evidence supports a finding of non-compliance.

[28] Father also challenges the finding that the visitation supervisor "has observed a lack of bond, lack of supervision, lack of appropriate communication, and trust issues between Child and Father." App. Vol. 2 at 78. As to a lack of a bond, the visitation supervisor testified that Child would "often not reciprocate [Father's] affection." Tr. Vol. 2 at 85. Although Father contends that the visitation supervisor did not observe Child show affection toward his foster parents, the testimony is nevertheless evidence of a lack of a bond. As to trust issues, there was testimony that a lack of a bond "can lead to trust issues and emotional instability . . . ." *Id.* at 85. As to communication-related concerns, there is evidence that Father spoke with five-year-old Child about "his bills, his lack of housing, [and] time he spent in jail." *Id.* at 86. Ultimately, Father's challenges to the findings regarding a lack of appropriate communication, a lack of a bond, and trust issues are requests to reweigh evidence. We decline.

[29]     As to a lack of supervision, Father asserts that the finding is unsupported because the pertinent evidence largely relates to the duration of his bathroom breaks. He also challenges findings related to his ability to provide housing, income, and proper nutrition. However, assuming *arguendo* that those challenged findings are erroneous—and that Father had stable housing, a stable income, and was appropriate with supervision and nutrition—we are not persuaded of reversible error. Indeed, as of the August 2019 hearing, Child was five-and-one-half years old. Child had been removed from parental care for approximately twenty months—a substantial portion of his life. Father missed visits while he was incarcerated and Father missed visits with no explanation. At no time did visits progress to unsupervised visits, in part because Father declined to participate in services aimed toward reunification. The positive drug tests reflect an unremedied issue with substance abuse—the extent of which is unknown because Father failed to complete the Hamilton Center intake. To the extent Father claims there is no evidence of parental unfitness, there is evidence of drug use as recent as the day the fact-finding hearing commenced. Moreover, Father declined a drug screen the month before the fact-finding hearing concluded. The court found, and the evidence supports, a lack of a bond that could negatively affect Child by leading to trust issues.

[30]     FCM Fissell testified that termination is in Child's best interests, noting that Father "has not followed through" with services. *Id.* at 74. Moreover, the CASA testified that termination is in Child's best interests, citing Father's "lack of consistency, the lack of communication, and the lack of follow through . . . ."

*Id.* at 98. Father challenges the finding that his "lack of commitment to the CHINS process demonstrates his lack of commitment to his child and shows a reasonable probability that he will continue to fail the Child." App. Vol. 2 at 68. Father claims that "he has shown a dedication to changing his situation to provide an appropriate home for his child." Br. of Father at 29. However, a court is free to give more weight to a parent's pattern of conduct than to a parent's recent efforts. *See In re E.M.*, 4 N.E.3d at 644. Furthermore, as the Indiana Supreme Court has explained, "children cannot wait indefinitely for their parents to work toward preservation or reunification—and courts 'need not wait until the child is irreversibly harmed such that the child's physical, mental, and social development is permanently impaired before terminating the parent-child relationship.'" *Id.* at 648 (quoting *In re K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1235 (Ind. 2013)).

[31] All in all, sufficient evidence supports the finding that terminating Father's parental rights is in Child's best interests. Moreover, because there is sufficient evidence supporting necessary findings under each statutory subsection, we conclude that there is sufficient evidence to terminate Father's parental rights.

# Mother

[32] To terminate parental rights upon consent, Indiana Code Section 31-35-1-6 requires specific findings. In pertinent part, the statute provides as follows:

> (a) . . . [T]he parents must give their consent in open court unless the court makes findings of fact upon the record that:

(1) the parents gave their consent in writing before a person authorized by law to take acknowledgments; and

(2) **the parents were**:

(A) **advised in accordance with section 12 of this chapter**; and

(B) advised that if they choose to appear in open court, the only issue before the court is whether their consent was voluntary.

(b) If:

(1) the court finds the conditions under subsection (a)(1) and (a)(2) have been met; and

(2) a parent appears in open court;

a court may consider only the issue of whether the parent's consent was voluntary.

I.C. § 31-35-1-6 (emphasis added).

[33] Section 12 specifies that "parents must be advised that," among other things, "the parents' consent cannot be based upon a promise regarding the child's adoption or contact of any type with the child after the parents voluntarily relinquish their parental rights of the child after entry of an order under this chapter terminating the parent-child relationship." I.C. § 31-35-1-12(9).

[34] Mother directs our attention to the written consent form. The form contains language tracking the first eight advisements from the statute. *Compare id. with* App. Vol. 2 at 84. However, the form omits the ninth advisement, which was added in 2012. DCS concedes that the ninth advisement was not on the form.

[35] At bottom, Mother is challenging the sufficiency of evidence that she received all of the statutory advisements. *See* I.C. §§ 31-35-1-6 (requiring a "finding of fact[] upon the record" that a parent was "advised in accordance with section 12") & 31-37-14-2 ("A finding in a proceeding to terminate parental rights must be based upon clear and convincing evidence."). To the extent DCS argues that Mother waived this sufficiency challenge by raising it for the first time on appeal, we conclude that the challenge is timely. *See, e.g.*, T.R. 52(A) (contemplating appellate challenges to a court's findings and conclusions). Moreover, to the extent DCS argues that any error is harmless, we note that a litigant challenging the sufficiency of evidence need not demonstrate harm separate from a failure of proof. *See In re R.S.*, 56 N.E.3d at 628 (explaining that courts review "whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment"); *cf. In re Bi.B.*, 69 N.E.3d at 469 ("[A] statutory requirement—even one that seems minor or technical—is still a requirement. And . . . where that requirement protects the fundamental rights of parents, it takes on particular importance.").

[36] Here, the trial court entered the following written findings pertinent to Mother:

> Upon the presentation and admission into evidence of a validly-executed Voluntary Relinquishment of Parental Rights notarized

by the court clerk and reviewed with Mother by her attorney, the Court granted a voluntary termination as to Mother. Mother declined to testify; her attorney stated he had reviewed her rights with her and the court clerk verified Mother's signature.

App. Vol. 2 at 59. The consent form provides sufficient evidence that Mother received eight advisements. As to the ninth, DCS directs us to the following statement from Mother's counsel: "I went over the rights and obligations and what she – the results of voluntary termination with her prior to her signing it. And she did sign the voluntary termination in front of me and acknowledged her signature in front of the court reporter, Your Honor." Tr. Vol. 2 at 29.

[37] According to DCS, "[w]hile the form is a tool, the form is not the law. Presumably, Mother's attorney and the judge knew the law, and shared the same with Mother." Br. of Appellee at 43. However, despite DCS's suggestion to the contrary, there is no indication that the court gave the ninth advisement. Moreover, the law requires clear and convincing evidence supporting the findings—it does not afford a presumption. We conclude that the record is equivocal as to whether Mother received the following statutory advisement:

> [T]he parents' consent cannot be based upon a promise regarding the child's adoption or contact of any type with the child after the parents voluntarily relinquish their parental rights of the child after entry of an order under this chapter terminating the parent-child relationship.

I.C. § 31-35-1-12(9).

[38] Ultimately, termination by written consent is proper only if Indiana Code Section 31-35-1-6(a) has been satisfied. *Neal v. DeKalb Cty. Div. of Family & Children*, 796 N.E.2d 280, 285 (Ind. 2003). Here, however, the record does not support a required finding under Indiana Code Section 31-35-1-6(a)(2)(A) (requiring a finding that a parent was "advised in accordance with section 12").

[39] Although the statutory requirement was not satisfied, it is well-settled that a parent may avoid written consent only where the purported consent was involuntary—*i.e.*, "procured by fraud, undue influence, duress, or other consent-vitiating factors." *In re M.R.*, 728 N.E.2d 204, 209 (Ind. Ct. App. 2000) (quoting *In re Snyder*, 418 N.E.2d 1171, 1180 (Ind. Ct. App. 1981)), *trans. denied*. Mother briefly argues that her consent was involuntary because she was addicted to methamphetamine, became ill after signing the form, did not receive one of the advisements, and wrote to the court after the termination of her parental rights. However, we are not persuaded that these circumstances render the attempt at consent involuntary. Rather, the consent is incomplete.

[40] Under these circumstances, we must remand for further fact-finding regarding whether Mother received the ninth statutory advisement. We therefore reverse the termination of Mother's parental rights and remand for such fact-finding.

# Conclusion

[41] There is sufficient evidence to terminate Father's parental rights, and so we affirm with respect to Father. As to Mother, there is equivocal evidence

regarding whether she received one of the required statutory advisements. We therefore reverse the termination of Mother's parental rights and remand for further fact-finding regarding whether Mother received the ninth advisement.

[42] Affirmed in part, reversed in part, and remanded.

Crone, J., and Altice, J., concur.